[Crim. No. 3055. In Bank.—January 19, 1928.]

THE PEOPLE, etc., Respondent, v. LONNIE JOHNSON, Appellant.

154

C. H. McCray and H. K. Landram for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

SEAWELL, J.—Lonnie Johnson was tried and convicted of the crime of murder in the first degree, which crime was, by the information filed against him, alleged to have been committed in the county of Merced, this state, on or about March 18, 1927, by unlawfully killing with malice afore-thought one May Evelyn Harris, also known as Dolly John-son. The verdict of the jury being one of murder in the first degree, without an assessment of the punishment at life imprisonment, carried with it the imposition of the death penalty. The court accordingly rendered judgment upon the verdict and imposed upon the defendant the extreme penalty of the law. · A motion for a new trial was made in due time based upon errors alleged to have been committed by the court at and during the trial in rulings upon the admissibility of certain evidence offered in the case and in giving and refusing to give certain requested instructions and also upon the insufficiency of the evidence to support the verdict and judgment. The motion for a new trial being by the court denied, the defendant has appealed to this court from the order denying said motion and from the judgment of conviction.

Appellant presses with much earnestness two alleged errors made by the trial court. The first consists in the giving of an instruction as to the defense of alibi which was phrased in substantially the same language as it has been given by the trial courts of this state for many years past, but the giving of which has been advised against by the more recent decisions of this state. (*People* v. *Arnold and Sayer*, 199 Cal. 471 [250 Pac. 168].) The second alleged error committed by the court consisted in permitting, over the objection of the defendant's counsel, on the ground that a showing of qualification was not first made, an under-taker and embalmer of human bodies, who was also the deputy coroner of the county of Merced, to express an opinion as to the probable number of hours life had been extinct in the body of May Evelyn Harris, or Dolly John-son, as she was also known, at the time the body was de-livered into his care.

The evidence offered to establish the criminal responsibility of the defendant is without conflict as to many of the main facts. The defendant and Dolly Johnson, as she was commonly known, were colored people and had for some time prior to the homicide been residing together as husband and wife in the colored folk district of the city of Merced. They resided in a small two-room house which had a screened porch annex. The location of the house is described as being between 14th and 15th Streets. The screened porch abuts on an alleyway and the front room sits back a few feet from the street. The defendant was the owner of a Ford machine and it was his habit to park it in front of his house or cabin during the night when it was not in use. On the afternoon of Friday, March 18, 1927, the defendant and his wife took Joe Wimberley and his wife, Ida May, colored acquaintances, as guests, on an automobile ride. The party arrived at the Wimberley home some time before 4 o'clock P. M. Defendant and his wife remained at the Wimberley home until 4:30 or 5 o'clock P. M., at which hour they left, ostensibly destined for their home. Their relations appeared to be friendly and cordial. This was the last time the deceased was seen alive by the Wimberleys. A short time after their departure, about 6 o'clock P. M., the defendant, Lonnie Johnson, and one Eddie Robinson, colored, visited the Wimberley home but for a few minutes and departed. They did not see Joe Wimberley, who was in a room of the house, but spoke a few unimportant words to his wife and departed. At a time fixed by the Wimberleys as about 9 o'clock P. M., the defendant went to the Wimberley home, knocked on the door, but not being admitted, inquired from without for Joe Wimberley. Joe Wimberley had retired for the evening, but his wife called to the defendant that her husband had gone out. The defendant then asked if his wife was at the Wimberley home and was informed by Mrs. Wimberley that she had not seen his wife since she left with him earlier in the evening. Upon being informed that his wife was not in the Wimberley home the defendant replied that he thought it was a "damn lie." His voice indicated anger. The evidence shows that defendant, Johnson, and Charley Griswold, also colored, were at the home of Eddie Robinson, situate within the district

in which the domiciles of all the persons heretofore mentioned are located, and that Griswold and Johnson had a slight disagreement as to some matter, whereupon Griswold left. He testified that he saw a revolver protruding from Johnson's right front trouser pocket. Johnson, until apprehended at Tonopah some three weeks thereafter, was last seen by any of his acquaintances, so far as they have spoken, at the hour of 7:30 o'clock P. M. March 18, 1927, when he left the Robinson home.

William Dunlap, who resided within forty feet of the cabin occupied by Johnson and his wife, was attracted by sounds which he described as a "mumbling noise" issuing from the Johnson cabin at 8 o'clock Friday night, March 18th, as he was about to enter his home. Before he entered he heard a shot that sounded in the direction of the Johnson cabin. He went to the rear of his house and looked over in the direction of the Johnson home and observed a faint light in the alley in close proximity to the cabin. He made no further investigation and retired. Between the hours of 1 and 3 o'clock the following morning he was awakened by someone, as he explained it, "in the place where Johnson lived," trying to start a car. After about twenty minutes of trial the car was set in motion and it went up the alley. On the following morning Wimberley, being on his way for a newspaper, stopped at the Johnson home to greet them. He and his wife were to be the guests of Johnson and his wife at dinner on that day. The automobile was not in its accustomed place and he was unable to arouse anyone within. Neither Johnson nor his wife could be located. On that afternoon, at 1:35, the city marshal of Livingston, upon information which he received, discovered the dead body of Dolly Johnson, fully attired, bearing a fatal bullet wound, under the bridge at Livingston where said bridge spans the Merced River. The body had evidently been conveyed by automobile to the approach of said bridge and dragged therefrom to a place under said bridge, where it was left uncovered, a distance of fifteen miles from the home of the Johnsons. The impression made upon the sandy soil by which the body was traced began at the edge of the highway and continued to the place where it was discovered early in the afternoon of Saturday, March 19th. The officers of the law

at once began a statewide search for Johnson and for his automobile. He had not intimated to any of his acquaintances the possibility of a sudden departure. He was finally located at Tonopah. The Johnson cabin was inspected immediately after the body was identified. The sleeping room in which Dolly Johnson was doubtless killed showed evidence of a struggle between her and her assailant. It contained but a few articles of furniture. The cot was somewhat disarranged, the stove was displaced, if not overturned, and a piece or two of crockery was broken. A pool of blood of considerable extent occupied a place near the cot and other spots or patches of human blood were traceable from the main pool of blood in the bedroom through the front room, down the steps leading outdoors and upon the ground to the place where Johnson habitually parked his car. Blood-stained shoe prints were observable upon the floor. Dirt had been thrown over the main pool of blood by the person who committed the crime.

Johnson when last seen on the afternoon and evening of March 18th wore khaki trousers with puttees or leathern leggins, tan shoes of the Nettleton brand, a shirt of a blue cast and a cap. He also owned a vest which was found with his effects at the time of his arrest. The chemist and biologist who made an examination of the articles of wearing apparel above described testified that upon each, as well as upon his shoe laces, he discovered spots or stains made by blood that was biologically human. The vest identified as belonging to Johnson contained a number of spots which reacted positively to the biological tests. The trousers and puttees also contained a number of blood spots, as did the soles of the defendant's shoes. Blood was found to have entered the crease or crevice made by the fastening of the sole of the shoe to the upper portion and these particles of blood, which had become dry, were well preserved. The shirt worn by the defendant on the night of March 18th had been washed and while it showed some faint evidence of blood stains, the expert was not willing to testify absolutely that the discolorations upon that garment were made by human blood. All of the above-described garments were inclosed in a handbag taken from the defendant's possession. He told the officer that he

left his gun at Merced and that his wife packed the handbag and that there were things in it he knew nothing about.

The bullet that killed Dolly Johnson entered her chest near the median line, ranged slightly downward and to the left, pierced both auricles of the heart and made its exit at a point near the spinal column. The autopsy physician testified that death occurred practically instantaneously with the infliction of the wound. Upon an examination of the premises a bullet hole about three and one-half or four feet above the floor was observed in the wooden partition that separated the bedroom from the screened porch. The bullet which made said hole evidently spent its force and was found in the sink where it had apparently dropped. This unquestionably was the bullet that had also passed through the body of Dolly Johnson. In measurement it appeared to correspond in size to what is known as a thirty-two caliber. The defendant, Johnson, owned such a revolver before the homicide and took it with him to Reno, where he pawned it at a pawnshop. The officer recovered it and it was received in evidence at the trial. It was thirty-two in caliber and resembled in general appearance the revolver which he had exhibited to Joe Wimberley, who had been his hunting companion on one or two occasions before the homicide. The bullet was evidently copper-jacketed. A fragment of the copper-jacket covering dropped from Dolly Johnson's clothing at the time they were taken from her body. Defendant was also the owner of a rifle.

Defendant offered in evidence a stipulation entered into by him and the district attorney whereby it was stipulated that J. A. Dieves, conductor of passenger train No. 87 of the Southern Pacific Company, who was confined to the hospital by reason of injuries at the time of trial, if called as a witness would testify that on the morning of March 19, 1927, he was in charge of said train No. 87, which ran from Merced to Oakland; that said train was about one hour and twenty-five minutes late on said morning, it being due to leave Merced at 1:55 o'clock A. M., but it did not leave on this particular day until 3:23 o'clock A. M.; that because of delayed departure the circumstance is remembered; that a colored man got on said train at Merced and went into the smoker; that said J. A. Dieves would identify the defendant as the colored man that got

on said train at 3:23 A. M. March 19th; that he wore a dark blue or black cap; that he left the train at Lathrop. The conductor's statement does not harmonize with the statements made by the defendant as to the time he left Merced nor as to his point of destination, nor with the records as to the tickets sold at the Merced office. The brakeman, who was in the smoking-car the greater portion of the way from Merced to Lathrop testified that he had no recollection of seeing a colored man board the train at Merced, nor of seeing him in the smoking-car at any time on the run in question. Conceding, against the great weight of the evidence to the contrary, that the conductor was right as to the defendant having boarded his train at 3:23 A. M., the defendant would have had something like seven hours and a half in which to drive to the Livingston bridge, a distance of fifteen miles from the house in which Dolly Johnson was doubtless killed, and return to Merced. This circumstance would not even tend to establish an alibi. At the preliminary hearing the defendant testified that he left Merced on train No. 87 at 2 o'clock Saturday morning. The only train he could have boarded after midnight was No. 87, which was one hour and twenty-eight minutes late. The defendant seemed to have lost sight of the delayed departure of said train if he even knew the regular hour of departure. He claimed that he arrived at the Merced station but a few minutes before the time of departure. Further, he testified that he went straight through to Sacramento without changing cars. As a matter of fact no train left Merced for Sacramento at the hour or anywhere near the hour defendant claims to have taken a train for Sacramento.

At Tonopah he replied to a statement made to him by the deputy sheriff of Merced County that he had seen him (Johnson) at Merced, that he had never been in Merced. Later he admitted his identity. In the early portion of his conversation with the deputy sheriff he said that he left Merced at 10 o'clock or 11 o'clock Friday night, March 18th, for Oakland. Upon being told that no train departed for Oakland at either of those hours, but a train was scheduled to leave regularly at 2 o'clock A. M., he adopted 2 o'clock as his hour of departure. He further stated that he went from Oakland to Reno and thence to Tonopah. The only

tickets sold at the Merced station to be used on train No. 87 were one to Oakland, one to San Francisco and return, and one to Santa Barbara and return. No Sacramento ticket was sold. The jury very likely believed that the defendant did not leave Merced by train but in the Ford that has not since been located, but if, as a matter of fact, he did leave by train he could not have left before 3:23 o'clock Saturday morning, March 19th, and that method of flight did not weaken in the slightest degree the case made against him. What the thought of the defendant was or what his mission or purpose may have been at the time he returned to the home of his friend Wimberley at the hour of 9 o'clock and made inquiries as to his whereabouts and was informed that he was not at home, and what prompted his inquiry later as to whether his wife was within, have not been explained. This was one hour after a near neighbor testified to hearing a strange noise at the Johnson home which was followed by the sound of a shot, as testified to by witness William Dunlap.

At Reno and Tonopah the defendant represented himself as Jackson and in accounting for his immediate need of funds he made several statements. He told one of his newly made acquaintances that he had a car in Salt Lake City out of which he had torn the rear end and that he was short of money for the reason that he and his wife had separated and she had gone back east to purchase a rooming-house. To a former acquaintance whom he chanced to meet at Reno he stated that he had had "a lot of hard luck"; that he lost his wife back east and buried her and his car broke down on the way back and he had put it in a shop. He said he was recently from Salt Lake.

We have substantially covered the evidence upon which the jury returned its verdict against the defendant. There is some testimony in the case tending to show an attempt made by the defendant to wrest himself from the officers' custody while being taken from the preliminary hearing to the jail. The defendant did not take the witness-chair in his own behalf. Neither did he offer any evidence of a substantial character. The questions presented to us for consideration are questions of law.

Applying the long approved legal test and which is crystallized into an instruction that was given in the in-

stant case and which is given in practically every case in which the element of circumstantial evidence constitutes a part if not the whole of the case presented, can it be said, as a matter of law, that there is any reasonable hypothesis based upon the evidence upon which the defendant may be innocent of the offense charged provided the circumstances relied upon for a conviction be true? On this subject the court instructed the jury that if there was any reasonable hypothesis upon which the defendant might be innocent, it was their duty to render a verdict of not guilty. "For," continued the instruction, "it is your duty not to look for some theory upon which you can convict the defendant, but, on the contrary, it is your duty, and the law requires you, if you can consistently do so, to reconcile any and all circumstances and the whole evidence of the case that have been shown, with the innocence of the defendant, and by doing so to acquit him." We cannot say, as a matter of law, that the jury's verdict does not respond to the requirements of the law with respect to the test that there is no rational hypothesis upon which defendant may be innocent and the facts and circumstances as proved be true.

Thirty-nine instructions covering seventeen typewritten pages of the record were given at the request of the defendant and they are certainly considerate of the defendant's rights. Said instructions constantly kept the rights of the defendant before the jury and emphasized by repetition and elaboration the rules of law that were most favorable to the defense. The instructions covered all possible phases of the homicide and the jury was even instructed, at the request of the defendant, as to the right of a person to defend himself against persons who violently assail him although there was no evidence adduced at the trial to show that defendant claimed or pretended to have acted in defense of his person. ▆ The instruction on the subject of alibi which was reviewed in *People* v. *Arnold and Sayer, supra,* was given in the instant case notwithstanding the observation we made in the case last cited. We feel that it could not have been harmful for the reason that there is absolutely no evidence in the case tending to show that the defendant was not at the place of the homicide at the time the crime was committed. The undisputed evidence is

that the defendant was at the Wimberley home, which is in close proximity to the Johnson home, one hour after the shot was heard by Dunlap. According to his own statement he did not leave Merced earlier than 2 o'clock or 3:23 A. M. o'clock March 19th. He offered no evidence tending to establish an alibi and there was none brought into the case to show that he was at a place other than the place where the crime was committed. The defense relied upon the theory that a case had not been proved against the defendant and not upon the defense of an alibi as it is distinctly known to the law. An instruction, however, was given upon the request of the defendant which informed the jury that in cases where a defendant relies upon the defense of alibi he is not required to prove it beyond a reasonable doubt nor by a preponderance of evidence, ''but to such a degree of certainty as will, when the whole evidence is considered, create and leave in the minds of the jury a reasonable doubt of the guilt of the accused.'' We feel satisfied that the defendant's case was in no way prejudiced by the instruction of which he now complains. It is substantially the same instruction that was given in the Arnold case and a long list of cases preceding it.

■ Error is predicated upon testimony given by Dr. F. E. Twining as to the caliber of the bullet found in the sink. The objections of the defendant to this line of testimony on the ground that the witness was not qualified to testify on the subject came after a number of questions as to the caliber of said bullet had been asked and answered without objection. The witness at best merely gave it as his opinion that the bullet was fired from a 32–20 cartridge. The bullet, however, was submitted to the inspection of the jury and whether it fitted the pistol of the defendant, which was also in evidence, was a matter which the jurors most likely determined for themselves. Besides, the witness showed some expert knowledge as to the weight and measurement of pistol bullets.

■ Appellant makes further complaint that the court committed prejudicial error in permitting the deputy coroner of Merced County, who was an embalmer of human bodies of some eight years' experience, to give an opinion as to the length of time the body of Dolly Johnson had been lifeless at the time he examined it on the afternoon

of the day following her disappearance. The witness testified that he had had war experience with dead bodies and that he had embalmed at least one thousand bodies. He testified that when he examined the body it was in a state of rigidity. His description of its condition indicates that it was in a marked stage of dissolution. In his opinion life became extinct twelve or fifteen hours before he examined it. No error was committed by the ruling. ■

As to the argument that no malice on the part of the defendant, which is a necessary element or ingredient of murder of the first degree, was shown by the case presented and, therefore, the penalty fixed by the jury cannot stand, it is sufficient to say, that the duty of affixing the penalty in murder cases of the first degree is, by section 190 of the Penal Code, committed to the sound discretion of the jury trying the case. ■ Malice, as defined by section 188 of the Penal Code, may be express or implied. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. Again these are questions which it is the province of the jury to determine. The ruthless disposition of the body of the deceased, following the killing, certainly is some evidence as to an abandoned or malignant heart upon the part of the slayer. ■ However this may be, section 1105 of the Penal Code provides that "the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." The defendant offered no proof to meet the burden which the law casts upon him and as there was no claim of justification or excuse offered for the killing of decedent or pretense that the proof tended to show that the crime committed only amounted to manslaughter, the crime was murder of the first degree.

■ Appellant has raised the point that certain statements purporting to have been made by the defendant as to his conduct and movements since the homicide were not freely and voluntarily obtained. The evidence is to the contrary. It is only where a confession is offered in evi-

dence that it devolves upon the prosecution to first show that the confession was freely and voluntarily made. This rule does not apply to statements, however harmful they may prove to be. (*People* v. *Ammerman*, 118 Cal. 23 [50 Pac. 15]; *People* v. *Shannon, ante,* p. 139 [263 Pac. 522].)

The observations of the trial court made at the time he denied defendant's motion for a new trial and pronounced judgment are set out in the clerk's transcript in full. Appellant commends them to our attention. They are not properly a part of the record. While the trial court may have experienced some personal qualms in performing the unpleasant duty of denying the motion and pronouncing a judgment of death, we cannot here do what the trial court judicially refused to do. He judicially approved the verdict of the jury by denying defendant's motion for a new trial and pronounced the judgment which is before us for review. We find no reversible error in the record.

The order and judgment are affirmed.

Richards, J., Shenk, J., Waste, C. J., Curtis, J., and Preston, J., concurred.

Rehearing denied.

All the Justices concurred.