[Crim. No. 4273. In Bank.—May 20, 1940.]

THE PEOPLE, Respondent, v. DeWITT CLINTON COOK, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley for Appellant.

Earl Warren, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THE COURT.—The defendant herein was charged with the crime of murder as set forth in the first count of an indictment that had been returned against him. In the same indictment he was charged with the commission of other offenses which consisted of two several counts of assault with a deadly weapon with intent to commit murder, one count of robbery, one of rape and three several counts of burglary,— to each of which charges he pleaded guilty. When the case was called for the taking of evidence by the trial court in the matter of fixing the degree of the crime of murder, defendant refused to testify. Thereupon the trial court of its own motion set aside the plea of guilty to the first count of the indictment and entered a plea of not guilty thereto on behalf of defendant. After trial was had by a jury on the charge of murder, defendant was convicted of the crime of murder in the first degree, without recommendation. Thereafter, a motion for a new trial was made and denied. Following pronouncement of judgment and the imposition of the death penalty, this appeal from the judgment and order denying a new trial was automatically presented to this court. (Sec. 1239, Pen. Code.)

The facts in this case, which in part were supplied from the confessions and extra-judicial statements voluntarily made by defendant, appear to be substantially as hereinafter related.

At approximately 9 o'clock on the evening of February 24, 1939, at the campus of the Los Angeles City College, defendant, a young man twenty years of age, struck a young woman named Anya Sosoyeva on the head with a piece of two-by-four. A few hours after the assault was committed, she died from the effects of the blow.

In the evening of the day on which the offense was committed, defendant, who was married and living with his wife and mother, left his home at about 7 o'clock, which was the usual time of his departure on occasions when he worked at night as a printer. However, he did not go to work that evening but, instead, he went to the campus grounds of the Los Angeles City College, and looked around the adjoining neighborhood with a view to burglarizing a house. As he did not

locate a house suitable for that purpose he thereupon decided to seize a purse instead, and he began to search for some object with which to strike his intended victim. Underneath a bench which was located beside a walk leading to the administration building on the campus grounds, he noticed a piece of two-by-four, which he picked up and carried with him while he resumed his walk around the neighborhood. A short time later he returned to the campus grounds and to the vicinity of the bench. After he had walked back and forth about forty-five minutes he observed a young woman, who was later identified as Miss Sosoyeva, coming toward him along the walk. After she had passed him, proceeding in a direction opposite to that pursued by defendant, he turned and followed her a few feet and then, wielding the piece of two-by-four by the use of both hands, he struck her a blow on the head, which caused her to fall to the ground. Immediately, defendant partly dragged, partly carried her to a tree—a distance of from eight to fifteen feet from the paved walk—for the reason, as asserted by defendant, that had she been left lying where she had fallen she might have been observed if anyone came along the walk. He attempted to stifle outcries which she made by placing his hand over her mouth, but as she was "making lots of noise" he became frightened and fled the scene—without taking her purse, however,—and made his escape through a portion of the campus grounds known as the Shakespearian Gardens.

According to the testimony of a police officer, who, shortly after 9 o'clock P. M., was called to the scene of the attack, Miss Sosoyeva was then seated beside a desk in a room of the administration building. Her head was cradled in her arms which were lying on the desk. He testified that there was blood on her face, that she was moaning, and that her only intelligible words were, "Oh, he hit me." Soon thereafter, she was removed to an emergency hospital where she received medical treatment. The doctor and nurse who attended her testified that at the time of her arrival Miss Sosoyeva was in a semi-conscious condition; that she was bleeding from her left ear; that there was blood on her face and head; and that an examination revealed a traumatic injury to the back of her head. She was then transferred to another hospital where, as a result of her injuries, she died at about 1:20 o'clock on the following morning. Before her death she was identified by a

young woman with whom she had shared an apartment which was located near the college campus. According to the testimony of her roommate, it appeared that Miss Sosoyeva was about twenty-seven years of age; and that when she was last seen by the witness at their apartment at approximately 6:30 P. M., on the evening of the assault, Miss Sosoyeva was dressing and making preparations for taking part in a theatrical performance which was to be held that night in the administration building of the Los Angeles City College.

The testimony of Police Captain D. R. Patton revealed that about 2:30 o'clock on the morning following the assault on and death of Miss Sosoyeva he visited the portion of the college campus where the attack had occurred, and on the making of an examination of the ground in that vicinity, he found leaning against a tree a section of two-by-four, to one end of which adhered some strands of blonde hair. He also found a comb, a glove for a man's right hand, which glove was stained with blood, and several spots of blood on the walk and on the ground a few feet therefrom. The left glove which was found in the Shakespearian Gardens, through which defendant had fled after the assault, also was marked with blood as well as with lipstick stains. On the taking of evidence it appeared that the blonde hairs found on the piece of two-by-four were of the same color and texture as the hair of the deceased, and that the lipstick marks found on the left glove were of the same color and chemical content as lipstick which had been found in the handbag of the deceased. Furthermore, by his extra-judicial statements and confessions it was established that the gloves had been identified by defendant as being the same gloves that he had secured in a burglary theretofore committed by him and which he admitted having worn on the occasion of the assault in question, in order to avoid leaving fingerprints.

Some months after the assault was committed and on August 28, 1939, defendant was taken into custody for questioning by the police in connection with certain burglary and other charges. While defendant was being taken to the police station in the police car it appeared that a piece of two-by-four, approximately eleven inches long, was found on the rear seat of the automobile where defendant was riding, and that when he observed it he was said to have remarked, ''My God, not that!'' However, it did not appear that the said section

of two-by-four was taken from defendant, nor was either of the accompanying police officers able to account for its presence in the automobile,—although it later was shown that it was not the same piece of two-by-four which defendant had used in committing the assault on Miss Sosoyeva. On the following morning, while he was being questioned specifically with regard to the "campus" crime, defendant made a full and complete confession of his connection therewith. Later he repeated the same confession before the members of the grand jury, which body returned the indictment against defendant.

At the trial of the case, in addition to the confession of defendant, a sound motion picture was presented in evidence which depicted a purported reenactment by defendant of the several incidents which related to the assault. Defendant declined to offer any evidence whatever in his own behalf.

Appellant's principal contention on this appeal is that the jury should have found that his crime amounted only to murder of the second degree. He argues that, independent of his confessions and extra-judicial statements, the evidence established only the fact that he committed the homicide. He contends that the following circumstances tend to show lack of premeditation: That at the time when the assault was committed appellant did not even know the deceased; that the blow was struck by an immature youth who would not have fully appreciated the consequences which might have resulted from the use of the weapon employed; that one seeking to take life would not have embarked unarmed on such an errand, and then have adopted and used for that purpose an instrument which chance placed in his hand near the scene of the assault; and that a person who had sought to take a human life would not have contented himself with a single blow while his intended victim still lived.

Appellant also argues that, apart from his extra-judicial statements and confessions, the evidence is positive that the homicide was not committed by him in perpetration of or attempt to perpetrate any of the crimes specifically enumerated in section 189, Penal Code, and, therefore, that in the absence of proof of premeditation on the part of appellant, the homicide amounted to no more than murder of the second degree. He argues that premeditation may not be presumed or inferred, but that it must be proved the same as any other ele-

ment of the offense; that the degree is an essential element of the *corpus delicti* of the crime and cannot be established by admissions and confessions of the defendant; and that where the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder, but that in such case the verdict should be murder of the second degree and not murder of the first degree (citing *People* v. *Howard*, 211 Cal. 322, 329 [295 Pac. 333, 71 A. L. R. 1385]).

Murder is defined as the unlawful killing of a human being with malice aforethought. (Sec. 187, Pen. Code.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature, and it is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart. (Sec. 188, Pen. Code.) All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree. (Sec. 189, Pen. Code.) Where homicide occurs in the course of the commission of any of the crimes of arson, rape, robbery, burglary, or mayhem (as enumerated in section 189, Penal Code), *intent* need not be proved. But where death otherwise results, wilfulness, premeditation and deliberation must be established in order to constitute the crime of first degree murder.

With regard to the crimes specifically mentioned in section 189, Penal Code, it appears to have been the theory of the prosecution that appellant intended to commit the crime of rape when he made the assault and that (excluding the confessions and admissions of the defendant) the facts and circumstances surrounding the commission of the assault were sufficient to show that he intended to commit such offense. However, aside from the extra-judicial statements and confessions of appellant, from a review of the record herein it does not appear that there was any direct evidence to show either the perpetration of or the attempt to perpetrate the crime of robbery, rape, or any of the other offenses particularly named in the code section,—even though it was apparent

that appellant had the opportunity for the commission of such offenses. But even if there was no evidence apart from the confessions and extra-judicial statements of the defendant to show that the crime was committed in an attempt to perpetrate any of the offenses enumerated in the code section, the jury would have been entitled to infer the existence of premeditation in the commission of the homicide, if it appeared that such a conclusion was warranted from a consideration of all the facts and circumstances connected with the assault. (*People* v. *Owens,* 27 Cal. App. (2d) 606, 611 [81 Pac. (2d) 429]; *People* v. *Wells,* 10 Cal. (2d) 610, 624 [76 Pac. (2d) 493]; *People* v. *Spinelli,* 14 Cal. (2d) 137, 142 [92 Pac. 1017]; *People* v. *Campos,* 10 Cal. App. (2d) 310, 315 [52 Pac. (2d) 251]; *People* v. *Johnson,* 203 Cal. 153, 164 [263 Pac. 524].)

In the case of *People* v. *Owens,* 27 Cal. App. (2d) 606, 610, 611 [81 Pac. (2d) 429], it was said: " ' . . . It is settled that "malice may always be inferred from the circumstances in the case—the evidence presented and considered by the jury." (*People* v. *Glover,* 141 Cal. 233, 243 [74 Pac. 745].) . . . The circumstances that were shown to have surrounded the homicide, including the character of weapon used, the nature of the wound inflicted, the fact that the deceased displayed no weapon of any character and was unarmed, the acts and conduct of the accused, furnished ample justification for the indulgence by the jury in the inference that appellant entertained a deliberate purpose to kill the deceased. This properly supported inference warranted the return of a verdict convicting appellant of murder in the first degree. (*People* v. *Mahatch,* 148 Cal. 200 [82 Pac. 779]; *People* v. *Bennett,* 161 Cal. 214 [118 Pac. 710]; *People* v. *Peete,* 54 Cal. App. 333, 342 [202 Pac. 51].) ' " There it was further said, quoting from the case entitled *People* v. *Fleming,* 218 Cal. 300 [23 Pac. (2d) 28] : " ' . . . this court has said on innumerable occasions that in order to prove premeditation in one charged with murder it is not necessary to show that any appreciable space of time elapsed between the intention to kill and the act of killing. . . . Where one assaults another violently with a deadly weapon and takes his life the presumption is that the assailant intended death or great bodily harm. (13 Cal. Jur., p. 683.) And where, as in this case, the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption

to be drawn therefrom is that the assailant intended to take the life of the person assailed.' "

And in the case of *People* v. *Wells,* 10 Cal. (2d) 610, 624 [76 Pac. (2d) 493], it was said: " . . . with respect to the issue of whether the offense was that of murder in the second degree: It was the exclusive province of the jury to determine from the evidence whether the killing was the 'wilful, deliberate and premeditated' act of defendant. In that connection, in the case of *People* v. *Mahatch,* 148 Cal. 200, 203 [82 Pac. 779] , in part it was said: 'The jury, having found that the only extenuating circumstance which he interposed had no existence in fact, and no claim of any circumstances of mitigation, justification, or excuse for the killing being advanced, had a right to infer, from the character of the weapon used, the nature of the wound inflicted, and the acts and conduct of the accused, the existence of a *deliberate purpose* on his part to kill the deceased when the fatal blow was struck, and, so inferring, were warranted in returning a verdict therefrom for murder in the first degree. This is the general, it may be said the universal, rule. If a different one prevailed, secret murders could rarely be punished by the infliction of the highest penalty. It is exclusively the province of a jury to determine the degree of crime when there is any evidence in the case which will support the determination.' " (Emphasis added.)

Also, in the recent case of *People* v. *Spinelli,* 14 Cal. (2d) 137, 142 [92 Pac. (2d) 1017], it was said, quoting from *People* v. *Johnson,* 203 Cal. 153 [263 Pac. 524], that " ' . . . section 1105 of the Penal Code provides that "the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable". The defendant offered no proof to meet the burden which the law casts upon him and as there was no claim of justification or excuse offered for the killing of decedent or pretense that the proof tended to show that the crime committed only amounted to manslaughter, the crime was murder of the first degree'."

As hereinbefore has been indicated, at the close of the case for the prosecution, appellant rested. He produced no evi-

dence on his own behalf, nor any which tended to show mitigation, excuse or justification for the commission of the crime with which he was charged. His confessions and extrajudicial statements were introduced in evidence upon stipulation of counsel and without objection on his part, nor were they or any of them challenged by him as having incorrectly reflected a true recital of the several statements and admissions which were therein attributed to him.

From the authorities hereinbefore cited it is apparent, therefore, that in the present case it was for the jury to determine the question of the presence of premeditation or lack thereof on the part of appellant in the commission of the crime, from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault; the conduct of her assailant in refusing or neglecting to aid her at a time when by his own statement he had formed the impression she was trying to call for help, and his immediate flight thereafter from the scene of the assault. However, appellant contends that "the very nature of the instrument which in this case did in fact cause death would negative a plan to take life, for it is difficult to believe that one would choose such a weapon to accomplish that intent". The instrument employed by appellant, from the use of which Anya Sosoyeva met her death, was a piece of two-by-four about two feet long. She was struck on the back of her head, the blow having been delivered by the use of both hands of her assailant. Although perhaps it may not be said that such an instrument is one which is inherently dangerous or deadly, nevertheless it is obvious that such a weapon may become so if used in a particular manner or if the blow be inflicted on certain portions of the body. (*People* v. *Valliere,* 123 Cal. 576 [56 Pac. 433].) In the last-cited case, it was ruled (syllabus) that "if the testimony shows that the question whether the instrument used was such as would be likely to produce death depends upon the *manner of its use* and the portion of the body *upon which it was used,* it becomes a mixed question of law and fact whether it was a deadly weapon, which the jury must determine under proper instructions from the court". (Emphasis added.) Also, in the case of *People* v. *Raleigh,* 128 Cal. App. 105, 108, 110 [16 Pac. (2d) 752], the

court pointed out the distinction between instrumentalities which are "weapons" in the strict sense of the word, such as guns, dirks, etc., and those instrumentalities which are not weapons in that sense, such as canes, hammers or other heavy objects. With reference to the latter classification the court said, "When it appears . . . that [such] an instrumentality . . . is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion *to use it as a weapon* should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." And it was held in that case that, if "from all the facts and circumstances the jury is convinced beyond a reasonable doubt that the instrumentality was one which, in the hands of the perpetrator of the robbery, was capable of being used in a 'dangerous or deadly' manner and that the perpetrator of the robbery *intended to use it as a 'weapon'* should the circumstances require, then the character of the particular instrumentality is established as a 'dangerous or deadly weapon' . . . " (Emphasis added.) Therefore, under all the facts and circumstances of the instant case the questions of the nature of the weapon and the manner of its use in their relation to the crime committed were for the determination of the jury. (*People* v. *Lee,* 23 Cal. App. (2d) 168 [72 Pac. (2d) 572]; *People* v. *Valliere,* 123 Cal. 576, 579 [56 Pac. 433].)

Appellant also contends that prejudicial error was committed by the trial court in its refusal to give to the jury the following instruction:

"The law presumes a man to intend what he does, but the law does not presume a killing with premeditated design. It is like every other element of murder in the first degree and must be proved beyond a reasonable doubt before the jury would be entitled to find the defendant guilty."

Appellant asserts that the refusal of the court to give that instruction was rendered particularly injurious to his rights by reason of two instructions which the court gave and which were substantially as follows:

"A person is presumed to intend to do that which he voluntarily and wilfully does in fact do, and must also be presumed to intend all of the natural, probable and usual consequences of his own acts. Therefore, if you are satisfied to a moral

certainty and beyond a reasonable doubt that the defendant did assault, on the date mentioned, one Anya Sosoyeva violently with a dangerous weapon, likely to kill, and which did in fact destroy the life of said Anya Sosoyeva the natural presumption is that such assailant intended death or great bodily harm, and in the absence of evidence to the contrary this presumption must prevail.''

One of those instructions contained the following additional statement that ''The wilful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent.''

With regard to the first portion of the instructions that were given, to which appellant has objected, he argues that the language therein expressed in effect told the jury that the mere proof of a felonious assault which resulted in death would *ipso facto* constitute proof of intent to kill and thus establish the premeditation embraced in the definition of first degree murder. Appellant contends that those instructions should have included the further advice that the deliberation and premeditation embraced in the definition of first degree murder were not to be presumed or inferred, but that the existence of those elements had to be proved to the same degree as any other element of the offense. However, from that which has been said hereinbefore, it is apparent that an objection to the two instructions on that ground is without merit. Moreover, in the case of *People* v. *Jones,* 160 Cal. 358, 370 [117 Pac. 176], it expressly is held that the rule contended for by appellant is without application to homicide cases. Other authorities to the same effect need not be cited.

With reference to that part of the instruction which advised the jury that ''the wilful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent'', it appears that the jury was not specifically instructed that it was the province of the jury to determine whether the weapon employed by appellant herein constituted a ''deadly'' weapon, nor was it instructed that ''a deadly weapon is one likely to produce death or great bodily harm''. (26 Cal. Jur., p. 573; see, also, *People* v. *Valliere,* 123 Cal. 576 [56 Pac. 433].)

However, in considering claimed errors in the giving of or refusal to give certain instructions, it becomes the duty of an appellate court to consider the entire cause, including

all the evidence, for the purpose of determining whether a miscarriage of justice has resulted (*People* v. *Fleming,* 166 Cal. 357 [136 Pac. 291, Ann. Cas. 1915B, 88] ; *People* v. *Hoffman*, 195 Cal. 295 [232 Pac. 974].) In the present case, aside from any other evidence, the extra-judicial statements and confessions of appellant indicated that when he went to the campus grounds on the night of the assault he intended to commit the crime of robbery. By that admission it is apparent that a consideration of the evidence in its entirety shows a violation by appellant of that portion of section 189, Penal Code, which provides that where a homicide occurs in the course of the perpetration of ·or attempt to perpetrate the crime of ''arson, rape, robbery, . . . '' the crime committed is murder of the first degree.

No prejudicial error appearing in the record herein, it is ordered that the judgment, and the order by which defendant's motion for a new trial was denied, be, and they are, affirmed.