[Crim. No. 3106. Third Dist. Feb. 27, 1961.]

THE PEOPLE, Respondent, v. LAWRENCE LARNIE
TAYLOR, JR., Appellant.

George T. Davis for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

SCHOTTKY, J.—Lawrence Larnie Taylor, Jr., has appealed from the judgment entered after a jury found him guilty of murder in the second degree and from the order of the court denying his motion for a new trial.

Appellant urges a number of grounds for a reversal of the judgment and order, but before discussing these we shall give a brief summary of the evidence as shown by the record.

On the morning of October 22, 1959, a two-door Buick sedan was found in the Klamath River about one-tenth of a mile from the Douglas Memorial Bridge. The car, which was removed from the river, belonged to Thurston Vincent Godspeed McGuffick. · A pair of trousers was discovered in the river near the point where the automobile had been found. A bunch of keys, one of which was the ignition key to the automobile, was attached to the trousers.

McGuffick's body was found on November 7, 1959. It was located some 75 feet off the road near the Klamath dump. The body was clothed with a ''T'' shirt and socks. An autopsy was performed on the body, and Dr. Robert Morris, the pathologist who performed the autopsy, testified that the body was in a considerable state of decomposition and that beetles and maggots were on it. The head showed a wound on the left parietal occipital area about one-half inch long and about one-quarter of an inch wide. There was considerable hemorrhage around this wound. On the right side of the head there was another puncture wound which was round,· and below it there was a jagged wound about an inch long and about one-half inch wide. There was less hemorrhage in the tissues under·this wound. The skull was fractured: The fracture began about the upper margin of the temporal bone and extended downward to the base of the skull. There was marked hemorrhage over the entire surface of the brain. There was an area of softening of the frontal lobe on the undersurface of the left side which could represent a point of contrecoup.

There were eight vertical puncture wounds on the left chest just inside the nipple area over an area 2 or 3 inches in diameter. These were approximately one-half inch long and were about one-quarter of an inch wide. There was considerable hemorrhage in the tissue under the wounds. Four of the puncture wounds penetrated the lower part of the upper lobe of the lung. On the right chest near the midline on the side was a superficial wound similar in size to the others, but this did not penetrate the chest wall.

Death was caused by the multiple wounds the deceased received and probably shock as a result of the hemorrhage in the chest and the brain. The puncture wounds were apparently caused by a thin instrument which was not more than one-half inch wide. The instrument could have been a knife. The wounds on the chest were probably made by a thrust straight into the chest. The hemorrhage in the brain was due to a blow to the head which probably caused the fracture of the skull.

Taylor, the appellant, spent the evening of October 21st and the early morning of the 22d playing poker with some friends in his apartment. He had been drinking. Taylor and a friend named McCovey left the apartment between 4:30 and 5 a. m. McCovey entered a telephone booth and placed a long distance call to his wife. Taylor went to find McCovey a ride to the home where he was staying. Both men entered the victim's automobile and were driven to McCovey's residence where McCovey left the car. Taylor returned to his apartment several hours later. He told his roommate, Glenn Scott, that he was in trouble. Later in the morning he told Scott that he had been riding in a car which had gone over the bluff. Taylor said that the driver was intoxicated; that the car was weaving all over the road; and that he had jumped from the car when it was driven over the bluff.

About October 31st Taylor had a conversation with William Scott and Gale Baker during which he told them that he had passed out in the back seat of the victim's car on the return trip; that when he awakened the victim was making homosexual advances toward him; and that a fight ensued during which the victim accosted Taylor with a knife which Taylor took away. Taylor also said that he had "done him in." In another conversation Taylor told them that he had stabbed the man and that he had disposed of the body.

Taylor also told Baker that he had lost his head and killed

a man. Again the story of self-defense was related. Taylor informed Baker that the body was near the Klamath dump. Baker was offered money if he would help move the body.

In a conversation with McCovey, Taylor also admitted that he had murdered the victim. McCovey also was offered money if he would help move the body.

After his arrest Taylor told the police that he had pushed the victim from the car after he awakened and found the victim attempting to perform an act of oral copulation upon him; that the victim came at Taylor with a knife which he took away from the victim; and that he had stabbed the victim three or four times.

Taylor testified in his own behalf. He stated that he had been drinking all day the 21st and all evening. He testified that he left the card game with McCovey and entered the victim's car. He fell asleep while on the return trip and that he woke up and found that the car was stopped and that the victim was performing the act previously described. Taylor testified that he then went crazy; that he kicked out the victim, who fell from the car; that the victim pulled a knife and started toward Taylor and jabbed at him with the knife. Taylor also testified that he was in fear for his life; that a fight ensued; and that he could not recall if he had stabbed the victim. Taylor admitted removing the body from the road and driving the car over the embankment into the Klamath River. Additional facts will appear in the discussion which follows.

█ The first contention of appellant is that the court erred in placing him twice in jeopardy for the same offense. After the jury was selected and sworn, and two alternate jurors were selected and sworn, a juror, a Mr. Robinson, told the court that because he had worked with the appellant's father off and on for 12 years and also because the appellant's sister lived next door to him it would be very difficult for him to give a just verdict for either side. Robinson requested a discharge which the court granted, and an alternate juror replaced him on the jury.

Section 1089 of the Penal Code reads in part: "If at any time, . . ., a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate . . . ."

There is no merit in appellant's contention that he was placed in double jeopardy. ■■■ Under the section a juror may be substituted without jeopardy attaching if good cause for dismissal of the juror exists. (*In re Devlin*, 139 Cal.App. 2d 810 [294 P.2d 466].) What constitutes good cause rests largely in the discretion of the trial court. Where a juror states his doubt as to his ability to perform his duty justly good cause exists. (*In re Devlin, supra*.)

■■■ Appellant next contends that it was error to allow into evidence photographs which showed the body of the victim at the location where it was discovered and also photographs which depicted the wounds inflicted upon the victim.

However the record shows that the photographs of the body at the location where it was discovered were introduced without any objection from appellant, and therefore appellant waived any right to object to them upon appeal. ■■■ But even if appellant had the right to now object to the pictures of the body at the place where it was found, we would hold that these pictures were admissible and relevant. They show appellant's conduct following the fatal injury, which acts may be considered in determining if appellant acted with an abandoned and malignant heart. (*People* v. *Ogg*, 159 Cal.App. 2d 38, 51 [323 P.2d 117].) More specifically, they show the ruthless disposition of the body of the deceased, following the killing, which is evidence of the abandoned and malignant heart of the appellant at the time of the killing. (*People* v. *Johnson*, 203 Cal. 153, 164 [263 P. 524].) Likewise they tended to clarify the evidence of the witnesses concerning the position of the body and the character of the terrain in which it was deposited by the appellant. (*People* v. *Smith*, 15 Cal.2d 640, 649 [104 P.2d 510].)

■■■ Appellant argues that the photographs of the body which were admitted over his objection were gruesome and served no purpose but to inflame the minds of the jury against him. This contention cannot be sustained. ■■■ What this court said in the recent case of *People* v. *Toth*, 182 Cal. App.2d 819, at page 826 [6 Cal.Rptr. 372], is applicable:

". . . In the trial of a charge of murder in the second degree it is essential for the People to establish malice aforethought. Such malice may be shown by the extent and severity of the injuries inflicted upon the victim and by the condition in which the victim was left by her attacker. This is what the People sought to establish by these photographs.

■ "As was stated in *People* v. *Cheary,* 48 Cal.2d 301, 312 [309 P.2d 431] :

" '. . . Although it is error to receive in evidence gruesome photographs of a homicide victim designed primarily to arouse the passions of the jury (*People* v. *Burns,* 109 Cal. App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9]; *People* v. *Redston,* 139 Cal.App.2d 485, 490-491 [293 P.2d 880]), such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant. (*People* v. *Reese,* 47 Cal.2d 112, 120-121 [301 P.2d 582].)

■ Whether the probative value of a particular photograph outweighs its possible prejudicial effect is a question to be resolved by the trial court in the exercise of its judicial discretion. (*People* v. *Reese, supra,* 47 Cal.2d at 120; *People* v. *Burns, supra,* 109 Cal.App.2d at 542.) The photographs in question were admitted in connection with the pathologist's testimony regarding the extent of the decedent's injuries and the cause of her death, the latter being a matter disputed by defendant. The photographs are corroborative of the pathologist's testimony and help to show the extent of the decedent's injuries. . . . ' "

■ In the instant case the People attempted to establish by the introduction of the photographs which showed the location of the body at the time it was discovered and by the photographs which showed the wounds inflicted upon the victim that this had been a killing with malice aforethought. As pointed out in the Toth decision, malice may be shown by the extent and severity of the injuries inflicted on the victim and by the condition in which the victim was left by his killer. This is exactly what the photographs in this case established.

Although the pictures of the body were admittedly gruesome, our examination of them convinces us that they not only were relevant but that they added something to the testimony of the pathologist. Whether the probative value of these photographs outweighed any possible prejudicial effect was a question to be resolved by the trial court in the exercise of its judicial discretion. In the instant case an able and experienced trial judge ruled that their probative value outweighed any possible prejudicial effect upon the appellant and also denied appellant's motion for a new trial. We are convinced that the trial court did not abuse its discretion in admitting the photographs.

■ Appellant contends also that it was error for the

court to give the jury the following instruction: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act."

This instruction is in the language of section 22 of the Penal Code and is a correct statement of the law. In *People* v. *Nagle,* 25 Cal.2d 216, the court said at page 225 [153 P.2d 344] : "The jury was correctly instructed upon the bearing intoxication might have upon the existence of intent, to constitute a crime, by the giving of an instruction in the words of section 22 of the Penal Code. . . ."

 Furthermore, even if the instruction were erroneous, appellant would hardly be in a position to complain because the instruction was given at his request. (*People* v. *Ballard,* 167 Cal.App.2d 803, 817 [335 P.2d 204] ; *People* v. *Contreras,* 167 Cal.App.2d 288, 290 [334 P.2d 208].)

 Appellant's final contention is that the evidence was insufficient to support the verdict of second degree murder as it failed to establish malice aforethought. The same contention was made in *People* v. *Toth, supra.* In ruling against said contention this court said at page 823 :

" 'Defendant argues that the verdict of second degree murder cannot be sustained because the evidence fails to establish malice, which is an essential element of that crime; he asserts that the most culpable offense of which he can be convicted is manslaughter. We cannot agree with this conclusion.

" 'Malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) . . .

" 'We must thus examine the evidence attending the killing to ascertain whether the jury was justified in impliedly finding that defendant acted with an "abandoned and malignant heart." The medical evidence discloses that the deceased had sustained numerous injuries on various parts of her body, many of which were unrelated to the fatal skull fracture. From this the jury reasonably could draw the inference that

498

defendant inflicted a severe beating upon his wife, during the course of which she received a nine inch skull fracture. The conclusion that defendant had beaten his wife severely finds support in his own admission that he thought he "killed her this time." That death resulting under such circumstances constitutes murder in the second degree is held in *People* v. *Burns, supra,* p. 534. (See also *People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51]; *People* v. *Cayer,* 102 Cal.App.2d 643 [228 P.2d 70.)' "

We are satisfied that the evidence in the instant case amply supports appellant's conviction of the crime of murder in the second degree.

The judgment and order are affirmed.

Van Dyke, P. J., and Peek, J., concurred.