Filed 8/7/15  P. v. Campos CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061387 |
| v. | (Super.Ct.No. SWF1102822) |
| MANUEL GILBERT CAMPOS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Christian F. Thierbach, Judge.  Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant, Manuel Gilbert Campos, of assault with a deadly weapon or instrument other than a firearm (Pen. Code, § 245, subd. (a)(1),[1] count 1), and the trial court sentenced him, after enhancements, to 35 years to life in state prison.[2]

Defendant appeals his conviction on the grounds that the prosecution failed to present substantial evidence that: (i) anyone used a deadly weapon in the assault; (ii) it was defendant, rather than a second attacker, who used such a weapon; and (iii) defendant knew of the weapon's existence and had the requisite intent for purposes of finding he aided or abetted the second attacker.

In addition, defendant contends his conviction should be overturned on the ground that his attorney denied him effective assistance by informing the jury that the other attacker had pled guilty to assault with a deadly weapon.

For the reasons *post*, we affirm the judgment.

# I

## FACTUAL BACKGROUND

On August 26, 2011, defendant and a second inmate engaged in an altercation with a third inmate in a common area of the Southwest Detention Center in Riverside. A deputy sheriff who witnessed the altercation described the events to the jury. The deputy

---

[1]    All further unlabeled statutory references are to the Penal Code.

[2]    The clerk of the Riverside County Superior Court erroneously indicated in the abstract that defendant was convicted by the court rather than a jury.

also described the events as captured by two surveillance cameras while the prosecution showed the video recordings to the jury.

The altercation began when deputies remotely unlocked the doors to a tier of cells, allowing the inmates to enter a common area. Defendant emerged from cell No. 24 and a second inmate emerged from the adjacent cell No. 22. Both moved immediately to the left and entered cell No. 10, where the victim was housed. Within seconds, all three inmates burst out of cell No. 10. Defendant and the second inmate pursued the victim, striking him repeatedly. The victim withdrew into the center of the common room and the two other inmates briefly stopped attacking him.

According to the testifying deputy, he did not observe the initial skirmish, but began watching the three inmates after they were in the common room. Most of the subsequent fighting occurred in a blind spot of the surveillance cameras. However, the deputy witnessed the fighting from an unobstructed position in a raised observation station about 15 to 20 feet away. The deputy testified that the second attacker faced the victim and was "fighting like you would normally expect someone to fight in a boxing stance," throwing "overhead punches" at the victim's face and upper torso. The deputy saw defendant striking at the victim too, but testified he "wasn't in a normal boxing stance." Instead, "he was picking his spots," "kind of hitting like in a stabbing or slashing-type motion" by swinging his right fist "from the side from [his] hip" and "up towards the shoulder." On redirect examination, the deputy recognized on viewing the video that when defendant came out of the victim's cell after the first skirmish, he threw an "overhead punch," but insisted that thereafter defendant's punches "were different

3

because he was pulling his hand . . . in a sideways motion from his hip." The deputy testified that he did not observe any weapons, but that it appeared from "the way he was holding his hand that [defendant] was holding something."

The deputy testified that he used the intercom to tell the inmates to stop fighting and "lock it down." Defendant and the second attacker broke off the fight, walked through the common room, and reconvened in front of the door to cell No. 6. The deputy testified initially that "it looks like they grab something out of cell 6." Later, he testified while viewing the surveillance video that only the second attacker was near cell No. 6 at the time. He later testified that it did not appear to him that either inmate had taken anything from the cell.

After a momentary pause, defendant and the second attacker approached the victim again, backed him up to a position in front of the same sliding door, and resumed fighting. The second attacker resumed "punching [the victim] again in that boxing stance" using "overhead punches . . . with both hands." Defendant also resumed fighting, according to the deputy, by "continu[ing] to make that jabbing motion." Though he testified defendant held his hand in a fist and appeared to be holding something, the deputy admitted he did not see anything in defendant's hand. In describing defendant's motion on cross-examination, the deputy testified, "I have seen many, many fights, ma'am. And I have never seen anything like that. The only time I have seen it was consistent in the shankings and different things like that that I have seen."

4

All together, the fighting lasted just over one minute.[3] The deputy testified that the victim defended himself throughout. The video shows vigorous fighting on the part of all three inmates. The deputy described the victim as having been hit "a lot."

When additional deputies arrived, defendant and the second attacker left the victim again. They first walked toward the left side of the common room, where a group of other inmates had congregated, and then took up positions outside the doors to their cells on the right side of the common room. The surveillance video shows that defendant's cellmate opened the door to cell No. 24, defendant reached toward the door, and the cellmate closed the door again. The deputy testified that the inmates complied with an order to lie on their stomachs. The deputy testified, and the surveillance video confirms, that defendant then took off his orange overshirt and stuffed it under the door of his cell. It appeared that defendant's cellmate pulled the shirt inside.

Once the deputies had secured the room and inmates, they examined the victim. He had suffered several injuries, the worst of which were cuts on his right cheek and his left shoulder blade. The deputy described "very clean . . . smooth cut[s]" whose "edges were smooth" and "not jagged." The deputy testified that the cut to the victim's cheek was not "very deep . . . just enough to make it bleed." He described the cut to the victim's back as being "like a deep paper cut." Photographs taken at the time and shown to the jury are consistent with his description. The deputy testified that, in his experience,

---

[3] The video recordings of the altercation include a timer, which shows the three skirmishes occurred between 7:04:08 p.m. and 7:04:19 p.m., 7:04:53 p.m. and 7:05:11 p.m., and 7:05:47 p.m. and 7:06:16 p.m.

the victim's cuts were consistent with cuts suffered by slashing victims and cuts caused by sharp instruments in prison fights. A second deputy testified that injuries suffered in the approximately one dozen prison shanking incidents he has seen are "[u]sually . . . a slice wound or a real sharp cut. Occasionally it's a—a stab or like a puncture."

At trial, the parties stipulated that the victim spoke to the deputy on August 26, 2011, after the attack, and stipulated to the content of his statement. The victim said he did not know why the attack happened and could not think of a reason the two inmates would attack him. The victim also told the deputy that he did not see what the two inmates "attacked him with." At trial, the victim appeared under duress and testified he did not know defendant, did not remember an altercation with defendant and the second attacker, and that he had suffered the injuries shown in the photographs in two separate falls in a prison shower in 2005.

The deputies also examined and searched defendant, the second attacker, and the common room area. They did not find anything that could have been used as a weapon on the inmates' persons. There was blood on the second attacker's shirt and hands and he had cuts on his hand. There were abrasions but no cuts on defendant's hands, and there was no blood on his undershirt, pants, or hands.

An investigating deputy found an altered toothbrush, a handle broken off a plastic spoon, and some droplets of blood on the floor of the common room near where the fighting took place. The prosecution introduced photographs of these instruments through the testimony of the investigating deputy, but did not introduce the instruments themselves. The toothbrush appears to have been burned on the brush end and broken

6

and burned on the grip end. The piece of plastic spoon is about one-inch long (the length of three lines of ruled paper as depicted in the photograph) and has no black marks that would indicate burning. The investigating deputy testified that the instruments did not have blood on them.

The deputy testified that both instruments could be made into shanks and inmates commonly use them for that purpose. He testified that "normally you have something sharp on the edges of . . . both of these." The toothbrush the deputy found does not appear to have sharp edges, and the deputy testified it is not a working shank in the state in which it was found. He testified that to make a toothbrush into a weapon inmates "will melt [the toothbrush] and they will melt a razor blade into the . . . end." He testified that a spoon handle can be made into a shank by "melt[ing] or sharpen[ing] [it] into a point . . . or they can insert the razor blade into the end to hold the razor blade." The deputy testified that he searched the whole common area, but did not find a razor blade or any other sharp or metal object that could have been used to turn the instruments into functioning shanks. He also testified that he conducted a search of the other inmates in their cells, but did not find any razor blades or sharp objects.

Both defendant and the second attacker were charged with using a deadly weapon to assault the victim. The second attacker pled guilty, but defendant went to trial to contest the charge. Defendant contended at trial that (i) no deadly weapon was used in the fight, (ii) the second attacker, not defendant, used a deadly weapon, and (iii) defendant did not know the second attacker used or planned to use a deadly weapon.

7

At a hearing the day before trial began, defendant's counsel requested that the trial court take judicial notice and inform the jury that the second attacker had pled guilty to the charge of assault with a deadly weapon. His counsel explained: "It is our position that it's the codefendant who assaulted with a deadly weapon, and my client didn't have knowledge that he intended to do that, or in fact knowledge that he was using a weapon." The trial court raised the objection that doing so was contrary to the standard jury instruction against jurors considering whether anyone else involved in a crime had been or would be prosecuted. Defendant's attorney responded that "the relevance is that the codefendant has already pled guilty to the assault with a deadly weapon. He didn't plead guilty to assault with force likely. He didn't plead guilty to simple assault. And I think it is entirely relevant as to whether or not my client used a weapon or not."

The court again questioned the relevance of the plea, and asked whether the second attacker would be testifying. Defendant's attorney said she did not plan to call him as a witness. The court then asked for the prosecution's position. The prosecution responded that it agreed with the court, understood the defense counsel's position, but had mixed feelings. When the court expressed its inclination to disallow the request, defendant's attorney objected stating, "When I discussed this matter with [the prosecutor], I asked her if she was going to object. It was one of the reasons that I—and she said no. It was one of the reasons I answered ready for trial and opted not to bring the codefendant down, otherwise I would certainly put him on the stand." The prosecutor indicated that she had "mixed feelings," but did not object, and the court indicated it would take notice of the guilty plea and inform the jury.

8

Later at the hearing, the prosecution moved to dismiss a second count against defendant alleging assault to commit mayhem under section 220. The prosecution explained that "I will actually state for the record that I have made a tactical decision not to bring the codefendant down. The filing of the 220 would have changed that decision . . . ."

After the final witness had been called, defense counsel "ask[ed] the Court to take judicial notice of the conviction of [the second attacker]." The trial court instructed the jury as follows: "Ladies and gentlemen, the Court is going to take judicial notice of the following: [The second attacker] was accused of and charged with a violation of Penal Code Section 245, Subdivision (a), Subsection (1), the same charge that's pending here against [defendant], in that on or about August 26th, 2011, in the County of Riverside, State of California, he did willfully and unlawfully commit an assault upon [the victim] with a deadly weapon other than a firearm. [¶] This accusation and charge arose from the same incident the defendant . . . is currently accused and charged with. [¶] And on January 4, 2012, [the second attacker] entered a plea of guilty to this charge. [¶] Now, when a Court takes judicial notice of something, what basically I am saying is I reviewed my own records here, and by my own records, I mean the Court records, the official records. And these records show that indeed what I just read to you occurred. So you can—the same thing, you are to accept that as a proven fact without any additional testimony."

At closing, both the defense and the prosecution relied on the plea to argue that a deadly weapon was used in the assault. Defendant's attorney argued: "What you have,

9

in fact, though, is [the second attacker's] admission. He pled guilty to the charges, not guilty to a simple assault. There is no evidence that he pled guilty as an aider and abettor. He pled guilty to the assault of [the victim] with a deadly weapon." She also argued that "[t]here is no evidence that my client knew, in fact, that [the second attacker] had a weapon" though "we know that he did . . . because he has already pled guilty to it." The prosecution agreed, arguing that "[t]his is assault with a deadly weapon. And we know that based on [the second attacker's] plea."

However, defendant's attorney also contended that there was no shank. She argued that the victim "wasn't shanked" and there was no evidence anyone had a shank or sharp object that could have been used to make a shank out of the instruments found at the scene. She also contended "no one came in and told you that those specific weapons were such of nature [*sic*] that they have the capability of causing great bodily injury or death" and no one testified that if one of the inmates "had slit [the victim's] throat with a blunt toothbrush, or piece of spoon, that in fact that's going to cause any sort of injury, other than the scratches [that] you saw." She did not attempt to explain how the conclusion that there was no shank fit with her concession that the second attacker had used one. Nor did she attempt to harmonize those positions by explicitly arguing them in the alternative.

The prosecution urged the jury to use its common sense and discount the defense counsel's arguments as inconsistent. She argued "they move from that to, 'Okay, [defendant] is guilty, but he is guilty of a simple misdemeanor assault. But nobody had a shank' . . . 'It wasn't a shank.' Then they go with, 'Okay. There was a shank, but [the

10

second attacker], he is the one who had it.  See, he pled guilty to assault with a deadly weapon.'"  She argued that "[t]he fact that [the second attacker] pled guilty to assault with a deadly weapon only proves that [the victim] was, in fact, assaulted with a deadly weapon."  Finally, she contended that the second attacker could have pled guilty as an aider and abettor if defendant was the perpetrator and that defendant should be found guilty as an aider and abettor even if the jury concluded the second attacker was the perpetrator.

During deliberations, the jury asked the court, "Have the items found on the floor . . . been ID'd as deadly weapons or is that up for question?"  The trial court responded, "[t]hat is a question only you folks can answer" and referred the jury to the definition of a deadly or dangerous weapon in the jury instructions.  The relevant instruction explains, "A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

The jury returned a verdict finding defendant guilty of assault with a deadly weapon.

## II

## ANALYSIS

1. *Sufficiency of the Evidence of Assault With a Deadly Weapon*

Defendant argues his conviction should be reversed because the prosecution presented insufficient evidence to sustain a finding that he committed an assault with a

11

deadly weapon and the trial court erred in denying his section 1118.1 motion.[4] He

contends there was insufficient evidence that a deadly weapon was used in the assault as

well as that he was culpable for the use of any such weapon.

On a challenge to the sufficiency of evidence supporting a conviction or to support

the denial of a section 1118.1 motion, we '"examine the whole record in the light most

favorable to the judgment to determine whether it discloses substantial evidence—

evidence that is reasonable, credible and of solid value—such that a reasonable trier of

fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We

presume in support of the judgment the existence of every fact the trier could reasonably

deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases

in which the prosecution relies primarily on circumstantial evidence . . . ." (*People v.

Houston* (2012) 54 Cal.4th 1186, 1215; accord, *People v. Hajek and Vo* (2014) 58 Cal.4th

1144, 1182-1183 (*Hajek and Vo*).) "'If the circumstances reasonably justify the trier of

fact's findings, the opinion of the reviewing court that the circumstances might also be

reasonably reconciled with a contrary finding does not warrant a reversal of the

judgment.' [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 668 (*Holt*).) This

standard is high, requiring an appellate court to "accept logical inferences that the jury

---

[4]     The People point out defendant brought his section 1118.1 motion for judgment of acquittal after the trial court had submitted the case to the jury, which makes it untimely. (§ 1118.1, subd. (a)(1).) This irregularity does not change our analysis because the error was harmless.

might have drawn from the evidence even if the court would have concluded otherwise." (*People v. Combs* (2004) 34 Cal.4th 821, 849.)

### a. *Use of a deadly weapon*

Defendant argues there was no substantial evidence that either defendant or the second attacker used a deadly weapon in the assault. He points out the deputy who observed the altercation admitted he did not see a weapon during the attack, deputies did not find a weapon on defendant or the second attacker after the attack, and the only items located near the scene were portions of a plastic toothbrush and a plastic spoon. Defendant argues the evidence shows these items could not be used as shanks without alteration and that deputies did not find a razor blade or other sharp object that could have turned them into shanks. He concludes "the record does not contain sufficient, solid, credible evidence that [the victim] was assaulted with a deadly weapon." We disagree.

For purposes of the section 245, subdivision (a)(1) proscription against "commit[ing] an assault upon the person of another with a deadly weapon or instrument," a deadly weapon is any "object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury."[5] (*People*

---

[5] The People point out section 245, subdivision (a)(1) proscribed assaults carried out by "any means of force likely to produce great bodily injury" in addition to those carried out "with a deadly weapon." That provision is not in issue here, however, because the complaint, the information, and the jury instructions focused exclusively on whether the assault was committed with a deadly weapon. We note that effective January 1, 2012, the proscription against assaults carried out "by any means of force likely to produce great bodily injury" has been moved from subdivision (a)(1) to its own subdivision, (a)(4). (Stats. 2011, ch. 183, § 1.)

*v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).) Objects such as the altered toothbrush and spoon handle found at the scene of this assault are "not deadly per se," but "may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*Id*. at p. 1029.) The jury was charged with deciding, among other things, whether defendant or the second attacker used these instruments in a sufficiently dangerous manner. (See, e.g., *People v. Cook* (1940) 15 Cal.2d 507, 516 [holding a piece of a two-by-four was a deadly weapon when used to strike the victim over the head]; *People v. Helms* (1966) 242 Cal.App.2d 476, 486-487 [holding a pillow was a deadly weapon when used in an attempt to smother the victim]; *People v. Russell* (1943) 59 Cal.App.2d 660, 664-665 [holding a fingernail file was a deadly weapon when used to strike the victim in the face].) In making that determination, the jury was free to "consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, *supra*, at pp. 1028-1029.)

The prosecution presented sufficient evidence for the jury to conclude that the altered toothbrush and spoon handle could be used to make deadly weapons. The jury heard the testimony of the deputy who investigated the scene of the assault after the inmates had been removed. The deputy described finding blood on the floor near "a piece of toothbrush that [he] believed to be a weapon." He also found a spoon handle in the same area. The deputy explained that it is common for inmates to make weapons out of prison-provided plastic spoons and toothbrushes by melting the plastic and then melting a blade or other sharp object into the plastic. The toothbrush had been altered by melting.

14

Neither instrument was attached to a blade or other sharp object when the deputy found the instruments, and he did not find any sharp objects in his subsequent search. However, the jury had sufficient evidence to infer that defendant was using a weapon during the fight and acted to conceal a blade afterward. The deputy who observed the altercation witnessed most of the fight through a window in an observation post about 15 to 20 feet away. He testified that defendant "was picking his spots," striking at the victim with a "stabbing or slashing-type motion." The deputy also testified that it appeared from "the way he was holding his hand that [defendant] was holding something." He also testified, "I have seen many, many fights," but had "never seen anything like" defendant's motion except "in the shankings and different things like that that I have seen." The surveillance video of the fight is inconclusive because the recordings have poor resolution and most of the fighting took place in a blind spot of the surveillance cameras. Those portions of the video recordings that do show the fight appear to be consistent with the testimony of the deputy who observed the altercation. The jury could reasonably credit that testimony and conclude defendant used some object to strike at the victim.

In addition, the nature of the victim's injuries are consistent with his being cut by a blade or other sharp object attached to either the toothbrush or spoon handle found at the scene. The deputy who observed the altercation testified, and photographs presented to the jury confirm, that the victim suffered two long, smooth cuts. That deputy testified that, in his experience, the victim's cuts were consistent with cuts suffered by slashing victims in prison fights. The deputy who investigated the scene after the fight testified

15

that injuries suffered in the prison shank incidents that he has seen are "[u]sually . . . a slice wound or a real sharp cut." The jury could reasonably conclude from the injuries that one of the inmates had some object with a sharp edge to strike at the victim.

Finally, the jury had sufficient evidence that one of the inmates disposed of a razor blade or other sharp object. The surveillance video shows that after the fighting, both inmates moved into a crowd of other inmates before proceeding to their own cells. Once defendant reached his cell, his cellmate opened the cell door, and defendant reached toward the door with one hand. The deputy testified and the video recording clearly shows that defendant then removed his outer shirt and stuffed it under the door to his cell. The deputy testified, and the video recording corroborates, that defendant's cellmate pulled the shirt under the crack of the door and into the cell. It was reasonable for the jury to conclude that the inmates sought to conceal evidence. Taken together with the evidence of defendant's manner in the attack, the nature of the injuries, and the fact that the toothbrush found on the scene had been melted in a way indicating to experienced deputies that it had been altered to be used as a shank, the jury could reasonably conclude that one of the two inmates took one of those opportunities to conceal a razor blade or other sharp object. Thus, this evidence provides a substantial basis for the jury to find that a deadly weapon was used in the assault.

Defendant objects that the victim's injuries were "not commensurate with being attacked and struck repeatedly with a shank or deadly weapon." It is true that the testimony and photographic evidence reveal that the victim suffered shallow cuts rather than puncture wounds or deep gashes. As defense counsel argued in her closing

16

argument to the jury, those injuries could have been caused by the sharp edge of an instrument such as the broken plastic spoon the deputies found at the scene. But they could also have been caused by a sharper instrument like a razor blade. One deputy testified that injuries suffered by shank victims were, in his experience, "[u]sually . . . a slice wound or a real sharp cut" and only "[o]ccasionally . . . a stab or like a puncture." The jury may reasonably have concluded that one of the attackers possessed and used a fully functional shank. Though we might reach a different conclusion, we are not permitted to substitute our own judgment for the judgment of the jury. (*People v. Banks* (2014) 59 Cal.4th 1113, 1156.)

### b. *Defendant's culpability*

Defendant contends there was no substantial evidence that he "was the one with the deadly weapon." We disagree.

The evidence recounted *ante* provides an adequate basis for the jury to conclude that defendant himself used a deadly weapon in the assault. Much of the evidence points directly to defendant as the perpetrator. The witnessing deputy testified that the defendant attacked the victim by employing "slashing" and "jabbing motions" and that he appeared to be holding something in his hand. According to the deputy, the other attacker did not fight in the same fashion. Instead, he punched the victim from a boxer's stance. Moreover, it was defendant, not the second attacker who appeared to hand something to his cellmate and then remove his shirt and stuff it under his cell door. Those actions gave the jury reason to infer that defendant was trying to avoid being caught with the missing blade.

17

Defendant argues the victim's "injuries to his shoulder and cheek are not consistent with the upward and sideways swinging punches" which, according to the deputy, characterized defendant's fighting. He argues that, if he had possessed a weapon, the victim would have "substantial penetrating injuries in his lower torso . . . not superficial cuts to his face or his upper shoulder," and concludes that "no reasonable juror could find that [defendant] inflicted the cuts to [the victim] with a shank." We disagree. As the deputy testified and the video evidence shows, the three men fought vigorously, the fight was fluid, and the victim actively defended himself. We must interpret the evidence in the light most favorable to the judgment, which includes presuming "the existence of every fact the trier could reasonably deduce from the evidence." (*Hajek and Vo*, *supra*, 58 Cal.4th at p.1183.) A reasonable jury could conclude that the victim's injuries were consistent with the free-wheeling fight described by the deputy and depicted in the surveillance video.

In view of the fact that the jury's verdict is supported by substantial evidence that defendant used a shank to attack the victim, we need not consider whether there was also substantial evidence that he aided and abetted the second attacker in doing so.

2. *Effective assistance of counsel*

Defendant contends his attorney provided inadequate representation by convincing the court to take judicial notice and inform the jury that the person with whom he committed the attack had already pled guilty to assault with a deadly weapon. He argues that this decision was constitutionally defective because it effectively withdrew his

18

strongest factual defense—that the attack was a simple assault because there was no deadly weapon—without providing any conceivable benefit.  We disagree.

The Sixth Amendment to the United States Constitution and article 1, section 15 of the California Constitution entitle criminal defendants to competent representation. (*Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*); *People v. Lucas* (1995) 12 Cal.4th 415, 436.)  The right to effective assistance of counsel "is meant to assure fairness in the adversary criminal process."  (*United States v. Morrison* (1981) 449 U.S. 361, 364.)  A defendant can expect his counsel to make rational and informed decisions on strategy and tactics that are grounded on adequate investigation and preparation.  (*In re Hall* (1981) 30 Cal.3d 408, 426; *People v. Frierson* (1979) 25 Cal.3d 142, 166.)  For defendant to prevail on his claim that he has been denied effective assistance, he must establish:  "(1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]"  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126; accord, *Holt*, *supra*, 15 Cal.4th at p. 703.)

a.  *Deficient performance of counsel*

In evaluating a claim of deficient performance, we give great deference to counsel's tactical decisions.  (*People v. Frye* (1998) 18 Cal.4th 894, 979.)  We evaluate trial counsel's decisionmaking in the context of the available facts, and generally do not find tactical errors at trial to be cause for reversing a judgment.  (*People v. Farnam* (2002) 28 Cal.4th 107, 148.)

19

We hesitate to find ineffective assistance on direct appeal because often the record is not developed enough to evaluate the attorney's conduct. (*People v. Pope* (1979) 23 Cal.3d 412, 426 ["Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus"].) Resources would be wasted if appellate courts reversed judgments for ineffective assistance, only to have "new defense counsel on retrial . . . do exactly what the original counsel did" based on some "informed tactical choice" not apparent in the appellate record. (*Id*. at pp. 425-426.) On direct appeal, we will "reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Zapien* (1993) 4 Cal.4th 929, 980 (*Zapien*) [quoting *People v. Fosselman* (1983) 33 Cal.3d 572, 581].)

The precedents are clear that attorneys may reasonably adopt trial tactics even if they entail making damaging admissions. In *Farnam*, the California Supreme Court held it was not ineffective assistance for defense counsel to admit at the guilt phase of a capital murder trial that defendant had a prior murder conviction. (*Farnam, supra,* 28 Cal.4th at pp. 148-150.) Trial counsel made that choice, despite the substantial risk of prejudice, because he reasonably feared jurors would react negatively toward defendant if they learned about the prior conviction for the first time during a later phase of the trial. (*Id*.) Similarly, in *People v. Welch*, the high court held it was not ineffective assistance for counsel to abjure an actual innocence defense in favor of the defense that the murder was not premeditated where the evidence of guilt was overwhelming. (*People v. Welch*

20

(1999) 20 Cal.4th 701, 728 (*Welch*).) Thus, trial counsel does not perform deficiently if there is a rational purpose that supports the challenged trial tactic, even if that choice involves making a damaging admission.

In this case, the defense counsel introduced the second attacker's guilty plea to support the conclusion that defendant did not wield the shank if the jury decided, despite counsel's arguments to the contrary, that someone did use a shank in the attack. Introducing the second attacker's guilty plea supported that conclusion by providing a basis for the jury to find the second attacker was the perpetrator. Before the jury learned of the guilty plea, there was no direct evidence the second attacker had wielded a weapon and the deputy who witnessed the attack testified that defendant, not the second attacker, fought as if he was using a weapon.[6] Introducing the guilty plea to the jury at least made plausible what otherwise would have been speculative. This change in the state of the evidence was important because defendant's contention that he did not know there was a weapon was consistent with other evidence about the fight. The deputy who observed the fight testified that he did not see a weapon, and the victim told deputies immediately after the fight that he did not see what the other inmates had used to attack him. The second

---

[6] Defendant contends there was evidence the second attacker had picked up a weapon from someone in cell No. 6 before the final skirmish. The witnessing deputy testified that "it looks like they grab something out of cell 6" and on cross-examination admits only the second attacker was near cell No. 6. But the deputy later testified while viewing the surveillance video that it did not appear either inmate had picked anything up from cell No. 6. Even if that testimony and the video recording provided *some* support for finding the second attacker had a weapon, introducing the guilty plea lent support to a conclusion that otherwise had little support in the evidence elicited at trial.

21

attacker's guilty plea therefore gave the jury a way to conclude that defendant was guilty of nothing more than simple assault.

In addition, defense counsel did not make much of a concession by introducing the guilty plea. Though circumstantial, the evidence that *someone* had used a shank in the attack was strong. The jury saw pictures of the victim's long, smooth cuts and heard testimony from experienced deputies that such injuries were consistent with injuries suffered by victims of shank attacks. Defense counsel could reasonably have feared that evidence was so powerful the jury would react negatively to defendant if he simply denied its import. On that basis, she may have concluded the jury would be *more likely* to credit defendant's denial that he used or knew about a shank if he acknowledged the evidence tended to show someone had used one. We conclude defense counsel could reasonably have concluded that introducing the guilty plea of the second attacker offered her client the best chance of a conviction for the lesser included misdemeanor offense of simple assault. Though defense counsel's tactic evidently did not succeed, it is exactly the kind of tactical trial decision we are hesitant to label deficient, especially on direct appeal. (*Zapien*, *supra*, 4 Cal.4th at p. 980.)

Defendant argues his trial attorney's decision was deficient because it did not show the second attacker wielded the weapon and introducing the guilty plea therefore "served no effective purpose other than to inform the jury that [the second attacker] pleaded guilty to assaulting [the victim] with a deadly weapon." We acknowledge that trial counsel said she believed the guilty plea tended to show it was the second attacker and not her client who used a shank. And we agree, strictly speaking, that view is

22

mistaken. Both men could be guilty of assault with a deadly weapon if one used a deadly weapon and the other aided him, as the trial court explained to the jury. The jury heard no evidence to indicate that the second attacker pled guilty specifically as the perpetrator and not as an accomplice. Thus, the guilty plea *did not* tend to show that the second attacker was the perpetrator. However, as we held above, we do not agree there was no conceivable benefit to making the concession. Defense counsel may have introduced the guilty plea because, in her judgment, the evidence that someone used a shank in the fight was significant and the jury was more likely to believe defendant did not know of the weapon if he acknowledged the import of that evidence. We cannot say the trial tactic could not serve the defendant's interests.

Defendant also argues his trial attorney's decision to admit the second attacker's guilty plea was deficient because it "provid[ed] support for a contested element of the prosecution's case." As discussed above, the acknowledgement of the existence of a deadly weapon was not much of a concession because of the strength of the circumstantial evidence that someone had used a deadly weapon. Furthermore, the California Supreme Court decision in *Welch* establishes that an attorney may decide for tactical reasons to *forgo* a defense entirely. (*Welch*, *supra*, 20 Cal.4th at p. 728.) We believe it follows that an attorney may, as happened in this case, decide to pursue one defense theory in a way that does damage to another defense theory. Defendant relies on *People v. Moreno* (1987) 188 Cal.App.3d 1179, 1190-1191 for the contrary position, but the lesson of that case is far narrower. In *Moreno*, the defendant was charged with driving while intoxicated, but disputed that he was the driver of the vehicle. (*Id.*)

23

Defense counsel failed to object when the prosecution introduced hearsay testimony that defendant was the driver, evidence that was a prerequisite for the prosecution introducing defendant's extrajudicial confession. (*Id.*) The *Moreno* court held that allowing the evidence to enter the trial was deficient because it was inadmissible, it enabled the prosecution to introduce defendant's confession, and the court could "conceive of no tactical reason whatsoever which might have dictated trial counsel's decision not to object." (*Id.* at p. 1191.) Thus *Moreno* stands for the narrower proposition that defense counsel performs deficiently by allowing improper evidence that tends to prove an element of the charge where the admission of the evidence does not provide any benefit to the defendant. For reasons we have explained above, defense counsel's decision in this case does not violate that principle.

### b. *Prejudice*

We have already held that, without considering the guilty plea, a jury *could reasonably have* found beyond a reasonable doubt that defendant used a deadly weapon to commit the assault. We must now decide whether there is a reasonable probability that without that evidence the jury *would have* had a reasonable doubt that defendant was guilty. (See *Strickland*, *supra*, 446 U.S. at p. 695.)

"Given this court's limited role on appeal, defendant [bore] an enormous burden in claiming there was insufficient evidence to sustain his conviction . . . ." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 [Fourth Dist., Div. Two].) Defendant's burden in challenging a conviction based on ineffective assistance of counsel is not so heavy. Defendant "need not show that counsel's deficient conduct more likely than not altered

24

the outcome in the case." (*Strickland*, *supra*, 466 U.S. at p. 693.) "Rather, the defendant must establish a reasonable probability that, but for counsel's errors, the result would have been more favorable to the defendant." (*In re Wilson* (1992) 3 Cal.4th 945, 956; see *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) A reasonable probability is simply a probability sufficient to undermine confidence in the outcome. (*Strickland*, *supra*, at p. 693.) We find no reason to disturb the jury's verdict.

Though the evidence that defendant used a functional shank in the assault is circumstantial, it is strong. First, deputies found pieces of a toothbrush and plastic spoon handle at the scene of the fight near droplets of blood. One deputy testified inmates often use such implements to fashion shanks by melting them and embedding a razor blade or other sharp object in the plastic. The deputy testified that his first reaction was that the toothbrush, which was melted on both ends, "was fashioned into a weapon." Second, the deputy who observed the fight testified defendant appeared to be holding something in his hand during the attack and struck at the victim by jabbing and slashing. He also testified he had seen fighting methods like those defendant used only in other shank attacks. Third, though deputies were not able to locate a razor blade or other sharp object of a sort that would have been embedded in the toothbrush, other circumstantial evidence suggests defendant concealed that evidence. When deputies broke up the fight, both defendant and the second attacker withdrew into a crowd of other inmates before taking up positions in front of their own cells. Once defendant was at his cell, his cellmate opened the door, and defendant reached one hand back toward the door. After the cellmate closed the door, defendant removed his outer shirt and stuffed it under his cell

25

door.  All of these actions imply that defendant was attempting to conceal evidence.  Finally, a deputy testified that the victim's injuries were consistent with injuries he had witnessed in other inmate fights involving sharp instruments.  Nearly everything about the incident implies that defendant used a shank in the attack.  Only the razor blade or other sharp object is missing.  We do not believe that there is a reasonable probability that the jury would have failed to convict defendant of assault with a deadly weapon if it had entered deliberations with this evidence alone and without knowledge of the second attacker's guilty plea.

Defendant points out that "the jury asked whether the toothbrush and spoon handle had been identified as deadly weapons," and argues that we know from its query that it was "the most significant issue raised by the evidence."  Defendant also argues that the jury's question indicates the jury "understood the significance of [the second attacker's] guilty plea" and "that at least one juror was not convinced that the prosecution had met its burden regarding the deadly weapon element, and that at least one other juror believed the guilty plea answered that issue."  We disagree.  We know only that the jury considered whether the implements found at the scene were used as deadly weapons and was unsure whether it was a factual question for them to resolve.  Anything more is speculation.  It may be that the jury considered whether the guilty plea established that the instruments found at the scene were deadly weapons.  Even if they did, the trial court's response more likely led the jurors away from relying on the guilty plea and toward relying on the other record evidence.  It was defendant's burden to undermine confidence in the verdict.  (*Ledesma*, *supra*, 43 Cal.3d at p. 218.)  Pointing to an isolated

question from the jury does not meet that burden when other record evidence amply supports it.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


RAMIREZ _____
P. J.

We concur:


MILLER _____
J.


CODRINGTON _____
J.