Filed 11/24/25  P. v. Huerta CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085991 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF180633) |
| RONNIE RAMON HUERTA, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed in part, reversed in part, and remanded.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Ronnie Ramon Huerta, Jr. (Huerta) appeals a judgment following his jury convictions on criminal counts related to his driving under the influence of a drug and causing the death of one victim and serious physical injuries to another victim. In particular, the jury found him guilty of: (1) second degree murder of Mark K. (Pen. Code, § 187, subd. (a), count 1); (2) willfully and unlawfully driving a vehicle under the influence of a drug and proximately causing injury to Alyson A. (Veh. Code, § 23153, subd. (f), count 2); (3) driving in willful and wanton disregard for the safety of persons and proximately causing injury to a person (Veh. Code, § 23105, subds. (a), (b), count 3); and (4) driving on a suspended license (Veh. Code, § 14601.1, subd. (a), count 4). The jury also found true the allegation that in committing count 2, Huerta personally caused great bodily injury (Pen. Code,[1] §§ 12022.7, subd. (a), 1192.7, subd. (c)(8)).

After Huerta waived his right to a jury trial on the truth of alleged aggravating factors, the court imposed a sentence of 15 years to life for count 1, a consecutive two-year term for count 2 plus a consecutive three-year term for the related enhancement, a concurrent term of one year four months for count 3, and a concurrent term of 180 days for count 4. Huerta appealed the judgment.

On appeal, Huerta contends that: (1) we should review the sealed transcript for any error committed by the trial court during the in camera hearing conducted on his *Pitchess*[2] motion; (2) the court erred by discharging a juror for violating its order prohibiting jurors from using electronic devices (e.g., cell phones) during trial; (3) substantial evidence does not support his

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

conviction on count 2; (4) the court erred by finding that the mitigating circumstance listed in section 1385, subdivision (c)(2)(F) did not apply to his count 2 offense; (5) substantial evidence does not support the court's finding that the aggravating factor listed in California Rules of Court,[3] rule 4.421(a)(1) applied to support its imposition of the middle two-year term for count 2; and (6) the court erred by imposing sentences for both counts 2 and 3 in violation of section 654. As we explain below, we agree that the trial court erred by imposing sentences for both counts 2 and 3 in violation of section 654. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of February 10, 2018, Huerta was driving on Dillon Road, a two-lane desert highway near Palm Springs. Driving between 80 and 120 miles per hour, he approached hundreds (if not thousands) of bicyclists who were participating in the Tour De Palm Springs charity bicycle ride. He often drove extremely close to the bicyclists. At one point, he drove into the opposing lane of traffic to pass a truck and encountered a car headed toward him. He then drove north onto the dirt far shoulder, swerved south back toward the road, and lost control of his car. His car "fishtailed," struck Mark K. and Alyson A., who were riding in a line of bicyclists along the road, and then rolled over after hitting a berm along the south side of the road. Mark K. was killed and Alyson A. was seriously injured.[4]

Immediately after the accident, Huerta got out of his car and yelled that he had killed someone. He then got back in his car and began throwing items out of his car, including a glass bong. Stating that he had to go, he

---

[3]     All references to rules are to the California Rules of Court.

[4]     Alyson A. was hospitalized for 10 days, had reconstructive surgery on her eyelid, and suffered from scars and much pain.

began to leave the scene, but a bicyclist told him that he needed to wait for the police. As he waited, Huerta was crying and rambling and stated that he needed to call his mother, go home to his mother, and go to his girlfriend's house. He appeared "out of it" and did not make sense.

At 9:20 a.m. that day, California Highway Patrol (CHP) Officer Isaiah Kee was dispatched to the scene of the accident. Arriving at the scene 20 to 30 minutes later, he found a glass bong which had broken into pieces. When Kee asked Huerta if he was okay, Huerta replied that he was. Kee observed that Huerta's lips were very white, his voice was raspy, his mouth was dry, he was fidgety (e.g., rubbing his arms and hands a lot), and his eyes quickly wandered back and forth "almost like paranoidal-style." Kee believed that Huerta's symptoms were consistent with impairment due to marijuana use. Another CHP officer found two cannabis containers, a lighter, and a medical marijuana card bearing Huerta's name at the scene.

At 9:38 a.m., CHP Officer Derek Thomas arrived at the scene. Thomas spoke with Huerta at the scene and again after he was taken to the hospital. At the scene, Huerta told Thomas that he was sorry that he had gotten into the accident. Thomas observed that Huerta had a dry mouth, blood shot and watery eyes, and was very jittery. Thomas smelled an odor of marijuana coming from Huerta and his car, although he did not smell that odor on Huerta after he was outside of his car.

At the hospital, Huerta told Thomas that he was driving to his girlfriend's house and going about 90 miles per hour at the time of the accident. As he was attempting to pass a slower vehicle, his car's wheels went onto the dirt shoulder and he overcorrected, losing control of his car and hitting the bicyclists. After the accident, he threw his bong out of the car. Huerta stated that he smoked marijuana every other day and had smoked it

4

at 1:48 a.m. that morning.  He had smoked three bowls and had sprinkled "kief" on top of them.[5]  He stated that he had then slept until 7:40 a.m.

At 11:45 a.m. while at the hospital, Thomas had Huerta perform a variety of field sobriety tests (FSTs).  Although Huerta performed satisfactorily on many of the tests, he missed the tip of his nose once on the finger-to-nose test and during the walk-and-turn test took ten instead of nine steps and struggled to keep his arms at his side.  Thomas believed that Huerta may have been driving under the influence of marijuana at the time of the accident.  He requested that a CHP drug recognition evaluator conduct a further evaluation.

At 1:53 p.m., CHP Officer Spencer Severing, a drug recognition evaluator, arrived at the CHP office and evaluated Huerta.  At 3:00 p.m. after having Huerta perform various sobriety tests, Severing concluded that Huerta was not under the influence of marijuana at that time.  However, Severing typically would not expect to observe signs of impairment five to six hours after marijuana use.  At trial, Severing explained that a person driving under the influence of marijuana has delayed reactions to hazards and may have adversely affected spatial awareness, depth perception, and executive functions.  The percipient witnesses' descriptions of Huerta's driving were consistent with a person driving under the influence of marijuana.

Severing recorded his interview with Huerta that day, which was played for the jury.  During that interview, Huerta stated that at 1:38 a.m. that day, he had smoked a bowl of marijuana with kief after getting home from work.  He estimated that he placed about one-half of a teaspoon of kief on top of the bowl containing about one-half to one gram of marijuana.  He used marijuana about four or five times per week.  It sometimes makes him

---

[5]     Kief is a highly concentrated form of marijuana.

feel paranoid. If he does not plan on going anywhere, he would smoke three bowls of marijuana in the morning and three more bowls every two hours, for a total of about five times a day. Huerta stated that he does not drive when under the influence of marijuana and knew it is dangerous. That day, he woke up at 7:00 a.m. and left his home at 9:00 a.m.

On April 4, 2018, CHP Investigator Jason Melvin recorded his interview with Huerta. During that interview, Huerta stated that at the time of the accident he was driving about 90 miles per hour because he wanted to get to his girlfriend's house. Although he had a bong in his car, he had not smoked marijuana prior to the accident. On two to four occasions in the past, he had felt high the next day after smoking marijuana with kief. Although he had smoked three bowls of marijuana with kief the night before the accident, he was not high when driving the next morning. He stated: "I'm pretty sure I was sober. I don't think I felt it that morning at all." He stated that he leaves cannabis cannisters in his car. He broke his bong after the accident because he was afraid the police would see it and throw him in jail. He stated that he had been investigated for driving under the influence of marijuana in the past when police smelled it in his car, but he had not smoked marijuana that day. He stated that he does not drive high because he had a friend who killed someone (presumably while driving under the influence) and knows that he could go to jail for it.

An amended information was filed, charging Huerta with the four counts described above. It also alleged that in committing count 2, he personally caused great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)).

At trial, the prosecution presented the above evidence, as well as scientific evidence and expert testimony. A blood sample collected from

6

Huerta at 3:05 p.m. on the day of the accident contained the following cannabinoids: (1) six nanograms per milliliter of delta-9-THC; (2) 2.3 nanograms per milliliter of hydroxy-delta-9-THC; and (3) 118 nanograms per milliliters of carboxy-delta-9-THC. Kristen Steward, a forensic toxicologist, testified as a prosecution expert on marijuana and its effects on a person. The levels of THC in a person's blood show its presence, but do not show impairment. THC enters the bloodstream after marijuana use and then quickly enters fatty tissue, including the brain. THC blood levels can drop by 80 to 90 percent within 30 minutes after it enters the brain and other fatty tissue. The metabolite hydroxy-THC can cause effects on the body. Although the metabolite carboxy-THC does not cause effects on the body, a high level of that metabolite indicates the person is a chronic user of marijuana.

Steward testified that the psychoactive effect of marijuana typically lasts for three to five hours, but can last up to 24 hours. According to one study, following abstinence, heavy chronic users of marijuana experienced neurocognitive deficits for days after use. Although some users of marijuana may not feel the effect of being high, they may still be impaired. A person who is nervous, fidgety, or jittery, has white lips and a dry mouth, and has a raspy voice and watery eyes, shows symptoms consistent with marijuana use. Also, a person's failures on FSTs can be signs of impairment.

Steward stated her opinion that if an accident occurred at 9:20 a.m. and FSTs were not performed until 11:45 a.m., the majority of the effects of marijuana use may have worn off and a person could perform the FSTs satisfactorily. That would also be true if the FSTs were performed again at 1:53 p.m. Given a hypothetical case matching Huerta's driving pattern on the day of the accident, Steward opined that such driving would be consistent with a person who could be impaired by marijuana use. Marijuana can cause

7

inattentive driving and speeding and affect a person's depth perception and ability to judge distances. Speeding is the most common reason drivers are pulled over for driving under the influence of marijuana. Steward's opinion that a driver was under the influence would not change if a drug recognition evaluator concluded at 1:53 p.m. that the driver was not under the influence of marijuana at that time because five hours would have passed since the hypothetical driving and it was very possible the major effects of marijuana had worn off. Steward believed that a blood level of six nanograms of delta-9-THC at 3:05 p.m. was not consistent with a person who had smoked marijuana at 1:38 a.m. In that amount of time, the level of delta-9-THC would have dropped to a level lower than six.

In his defense, Huerta presented the testimony of his mother. She stated that Huerta was 21 years old at the time of the accident. Although she saw him the morning of the accident, she did not see him smoke marijuana, did not smell it on him, and did not believe that he was under the influence of marijuana.

Okorie Okorocha, a forensic toxicologist, testified as an expert witness for the defense regarding marijuana and its effects on a person. Okorocha testified that a person can have six nanograms of THC in their system 13 hours after marijuana use. A chronic or continuous user of marijuana will always have some THC in their system. For example, a chronic user can have delta-9-THC in their system after 30 days of abstinence. There also can be high levels of THC in a user's blood, but none in their brain. Okorocha testified that there is no correlation between the level of THC in a person's system and impairment.

Okorocha also testified that, according to the National Highway Traffic Safety Administration, there is no increased crash risk associated with THC

8

in a driver's system and there is no link between THC and speeding. No studies show a correlation between objective signs of marijuana use and impairment. If THC does impair a person, it does so for two or three hours. THC does not always cause impairment and can even make some persons drive better. A chronic user of marijuana is potentially far less impaired from use than a casual user. Okorocha opined that if a person had smoked three bowls of marijuana with kief at 1:48 a.m., that person would not be impaired at 9:00 a.m. (i.e., seven hours later).

Elizabeth Cauffman, a psychology professor, testified as an expert on adolescent development. She had not met Huerta or reviewed any police reports or other materials relating to his case. She testified, among other things, that an adolescent's frontal lobe is the last part of the brain to develop, delaying impulse control and self-regulation. The development of adolescents who use substances is more delayed than the development of other adolescents. A person tends to be fully developed by age 25.

The jury found Huerta guilty on all four counts. It also found true the allegation related to count 2. The trial court sentenced him to a total term of 20 years to life in prison, consisting of an indeterminate term of 15 years to life for count 1, a consecutive two-year term for count 2 plus a consecutive three-year term for the related enhancement, a concurrent term of one year four months for count 3, and a concurrent term of 180 days for count 4. Huerta timely filed a notice of appeal challenging the judgment.

## DISCUSSION

## I

### *Hearing on Pitchess Motion*

Before trial, Huerta filed a *Pitchess* motion requesting that the trial court conduct an in camera hearing to ascertain whether there was any

9

discoverable evidence contained in Thomas's personnel records. His motion sought any evidence of complaints against Thomas associated with his fabrication of evidence, illegal searches, and credibility. The prosecution then filed a *Pitchess* motion on behalf of Huerta also requesting such an in camera hearing. On behalf of Thomas, the CHP filed oppositions to the *Pitchess* motions filed by Huerta and the prosecution. The trial court granted the two *Pitchess* motions, conducted an in camera hearing, ordered the disclosure to Huerta and the prosecution of certain information subject to a protective order, and sealed the transcript of the hearing.

On appeal, Huerta requests that we review the sealed transcript of the trial court's in camera hearing on the *Pitchess* motions to determine whether the court followed the proper procedures for discovery of the requested information regarding Thomas and whether all discoverable material was turned over to him. The People do not oppose Huerta's request.

A defendant is entitled to discovery of a law enforcement officer's confidential personnel records if those files contain information that is potentially relevant to the defense. (Evid. Code, §§ 1043–1045; *Pitchess, supra*, 11 Cal.3d at pp. 537–538.) The discovery procedure has two steps. First, the defendant must file a motion seeking such records, containing affidavits "showing good cause for the discovery or disclosure sought [and] setting forth the materiality thereof to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) If good cause is shown, "the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1229.) "Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt

10

whether a particular document is relevant, he or she should present it to the trial court." (*Id*. at p. 1229.) "The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review." (*Ibid*.) The trial court reviews the records in camera to determine whether any of them are relevant to the intended defense. (Evid. Code, § 1045, subd. (b).) "A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

We have independently reviewed the sealed transcript of the trial court's in camera hearing. Based on our review, we conclude that the trial court followed proper procedures, conducted the proper inquiry into the discoverability of information in Thomas's personnel records, made an adequate record for our review, and correctly ordered the disclosure to Huerta of all discoverable material.

## II

### *Discharge of Juror No. 7*

Huerta contends that the trial court erred by discharging a juror for violating its order prohibiting jurors from using electronic devices (e.g., cell phones) during trial.

### A

Before the evidentiary phase of the trial began, the trial court instructed the jury with CALCRIM No. 101, stating in relevant part:

> "Do not use the Internet or a dictionary or other relevant sources of information or means [of] communication in any way in connection with this case either on your own or as a group. Do not investigate the facts or the law or do any research regarding this case or any of its participants. . . .

"If you have a cell phone or other electronic device, keep it turned off while you are in the courtroom and during jury deliberations. An electronic device includes any data storage device."

After a lunch break during the evidentiary phase, the prosecutor, out of the jury's presence, informed the trial court that she had observed the courtroom deputy approach Juror No. 7 that morning during her questioning of a prosecution witness (i.e., Severing). She was thereafter informed that Juror No. 7 had been "on his cell phone, scrolling through something on his cell phone in the middle of testimony. One of the audience members saw it, reported it to my advocate, who reported it to the deputy."

The prosecutor stated: "My concern at this point is we have a juror who's not paying attention to testimony, who is scrolling through his cell phone. I don't know if he's Googling what we're talking about. I don't know what exactly he's doing. I think it was probably fairly obvious to him that it was someone from the prosecution team that essentially ratted him out to the deputy. I'm a little concerned about that at this point." Huerta's counsel replied: "I mean, it is problematic. I think the Court at least has to inquire [of] that juror about what he was looking at. I'd be okay with excusing him. We have three alternate[] [jurors]. Whatever the Court wants to do."

When the court asked the prosecutor what she would like the court to do, she answered: "I'd ask the Court to excuse him. [¶] We can inquire if the Court thinks we need to. But at this point, we know he's not paying attention to the testimony. He's doing other things on his cell phone during the testimony." She added: "The advocate's concern was that after that, they believed the juror was kind of giving dirty looks towards that part of the courtroom. I didn't see it, so I can't tell the Court what did or did not happen. But they were concerned that there appeared to be some animosity there."

12

The court stated that the fair thing to do would be to bring Juror No. 7 in and ask him what he was doing before the deputy contacted him and why he did not comply with the court's order to turn off his electronic device while in the courtroom.

After Juror No. 7 was brought into the courtroom, the court asked him what the deputy had spoken to him about during the testimony before the lunch period. Juror No. 7 replied:

> "I guess somebody was—I was checking a spelling word. My spelling ain't that great. I was trying to make sure I was getting it down correctly.

> "If there's a question I would like to ask the witness, if the defense asks it—so I was making sure I had the spelling correctly."

He explained that he was checking the correct spelling of the word "cigarettes." The court then stated that it had previously ordered all jurors to keep their phones off during the pendency of the trial and they could not use those devices while serving as jurors. When the court asked him whether he heard that requirement, Juror No. 7 replied: "I don't remember to turn off, but I do remember not using it. [¶] . . . [¶] I didn't think—with my spelling ability, it's something that I normally just do. And it's not—I don't send it to no one. It's something I just check for spelling purposes." The court further stated: "And of course I have given you and all the other jurors the admonition not to consider any information from outside the courtroom as well. That includes spelling." Juror No. 7 replied: "Okay. Sorry."

The prosecutor then asked Juror No. 7: "I want to make sure you don't harbor any anger for [the fact the prosecutor brought up his cell phone use to the court's attention] or feel mad that we had to address this with you, for one side or the other." He replied, "No." The court then asked him: "Are you

13

upset or displeased with anybody in the audience who might have seen you do that?" He replied, "No." He elaborated on his explanation for his cell phone use, stating:

> "It's something that I normally do, and I wasn't thinking in the process of doing it. Because it's something—how I normally just process words in my head. And sometimes I do need to kind of clear it out to make sure all the spelling—I guess you can say grammar—would be correct. [¶] But I understand that what I did was inappropriate, if I used the right term. And I apologize for that."

Huerta's counsel had no questions for Juror No. 7.

The court excused Juror No. 7 from the courtroom and then discussed the matter with counsel out of the jury's presence. The prosecutor restated her position that Juror No. 7 should be excused, explaining that he "disobeyed a direct order of the Court so that he could essentially conduct research related to the case. I realize it was a spelling he was looking up, but it was still research related to the case on his cell phone. [¶] I have concerns that that could happen again. It could be on something related to evidence in the case, so I'm going to still ask the Court to excuse the juror."

Huerta's counsel did not believe Juror No. 7 should be excused, arguing: "I don't think we heard anything from [him] . . . that would affect his ability to follow the law and be fair and impartial. He wasn't doing research. He was just looking for the spelling of a word. It seemed to be kind of an innocent thing where he really wasn't thinking about it, just did it, not being an intentional act of violating a court order. [¶] And based on what he said, he didn't say anything that would lead the Court to believe that he could not continue as a juror."

The court conceded the question of whether to discharge Juror No. 7 was "a difficult call. On the one hand, my instructions were abundantly

14

clear, and the orders I issued as to their conduct were quite intentional. On the other hand, I don't have a reason to believe that the mistake was—the use of the phone was an intentional violation in the sense that, shall we say, a specific intent to violate the order. [¶] But nonetheless, it was a—to draw an analogy—more of a violation of a general-intent crime. [¶] I'm confronted with a violation of a court order regardless of the subjective perception of the . . . juror, I do not believe I can count that against the order—I mean, the violation of the order by permitting the juror to remain. I must have jurors who will follow orders and who will follow the rules. And inadvertent—I should say, even inadvertent violations can be the basis for removal."

The court continued: "In this particular case, the violation is accessing the World Wide Web on his phone as opposed to a—violating an order such as talking to the lawyers in the elevator, which is not, in the scheme of potential violations of court orders as egregious as accessing—as egregious as an active juror during testimony accessing a cell phone. [¶] So for those reasons, I am ordering the removal of [Juror No. 7] in this matter for violating a court order. And we need to replace that person with one of the three alternates." Huerta's counsel then noted on the record his objection to the court's removal of Juror No. 7. The court thereafter excused Juror No. 7 and replaced him with one of the three alternate jurors.

B

Section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box. . . ." Discharge of a juror under section 1089 "is committed to the discretion of the trial court, and we review

15

such decisions by asking whether the grounds for such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137 (*Thompson*).)

Our Supreme Court explained the demonstrable reality standard as follows: "We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality. [Citations.] The demonstrable reality test 'requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established.' [Citation.] To determine whether the trial court's conclusion is 'manifestly supported by evidence on which the court actually relied,' we consider not just the evidence itself, but also the record of reasons the court provided. [Citation.] In doing so, we will not reweigh the evidence. [Citation.]" (*People v. Wilson* (2008) 43 Cal.4th 1, 26 (*Wilson*).) "Under the demonstrable reality standard, . . . the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 (*Barnwell*).)

Good cause for discharge of a juror has been found in various circumstances in which a juror is unable to perform his or her duty, including the failure to follow the court's instructions. (See, e.g., *People v. Williams* (2015) 61 Cal.4th 1244, 1262 (*Williams*); *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69–70 (*Allen and Johnson*) ["The court may discharge a juror for good cause (see § 1089), which includes a failure to follow the court's instructions [citation]."]; *People v. Williams* (2001) 25 Cal.4th 441, 448 ["A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of . . . section 1089."].) Furthermore, "[a] juror who

16

violates his or her oath and the trial court's instructions is guilty of misconduct." (*People v. Linton* (2013) 56 Cal.4th 1146, 1194 (*Linton*).)  The determination of what constitutes good cause under section 1089 "rests largely in the discretion of the trial court." (*People v. Taylor* (1961) 189 Cal.App.2d 490, 495.)

C

Although Huerta concedes that Juror No. 7 violated the trial court's instruction by using his cell phone during witness testimony, he nevertheless apparently argues that the court abused its discretion under section 1089 by discharging that juror because the record does not show that he was biased. However, actual bias of a juror is not the sole ground on which a trial court may find good cause to discharge a juror under section 1089.  (*People v. Daniels* (1991) 52 Cal.3d 815, 863–864 [court may discharge juror for " 'neutral' " misconduct which does not suggest bias].)  In particular, as discussed above, a court may find good cause to discharge a juror for failure to follow its instructions.  (*Williams, supra*, 61 Cal.4th at p. 1262; *Allen and Johnson, supra*, 53 Cal.4th at pp. 69–70; *People v. Williams, supra*, 25 Cal.4th at p. 448.)

Based on our review of the record, we conclude that the trial court did not abuse its discretion under section 1089 by discharging Juror No. 7 because "the grounds for [his] removal appear in the record as a demonstrable reality." (*Thompson, supra*, 49 Cal.4th at p. 137.)  Specifically, the record shows that the court, as a trier of fact, found that Juror No. 7 had failed to follow its instructions that jurors both turn off their cell phones while in the courtroom and not use the Internet in any way in connection with this case.  In exercising its discretion to discharge Juror No. 7, the court explained its reasoning:  "I must have jurors who will follow orders and who

17

will follow the rules. . . . [E]ven inadvertent violations can be the basis for removal. [¶] In this particular case, the violation is accessing the World Wide Web on his phone." The court considered that violation of its instructions to be sufficiently egregious to warrant its discharge of Juror No. 7.

The record shows that the court both relied on evidence in the record showing Juror No. 7's violation of its instructions and explained its reasons for discharging him. (*Wilson, supra*, 43 Cal.4th at p. 26.) In reviewing the court's exercise of its discretion under section 1089, we do not reweigh the evidence. (*Ibid.*) Accordingly, applying the demonstrable reality standard, we are "confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Barnwell, supra*, 41 Cal.4th at p. 1053.) Therefore, we conclude the court did not abuse its discretion by discharging Juror No. 7 under section 1089 and Huerta has not carried his burden on appeal to show otherwise.[6] Because we conclude that the court did not err by discharging Juror No. 7, we need not, and do not, address the question of whether any error in discharging him was prejudicial to Huerta.

## III

### *Substantial Evidence to Support Conviction on Count 2*

---

[6]      The cases cited by Huerta in support of his argument are inapposite to this case and do not persuade us to reach a contrary conclusion. (See, e.g., *Barnwell, supra*, 41 Cal.4th at p. 1053 [demonstrable reality shown for court's discharge of juror for bias and not, as in this case, juror's failure to follow court's instructions]; *Linton, supra*, 56 Cal.4th at pp. 1191–1196 [unlike in this case, trial court exercised its discretion to *not* discharge juror for purported failure to follow its instructions].) Furthermore, the fact that the trial court chose not to discharge a different juror who apparently had requested additional paper from the prosecutor's advocate, does not show, as Huerta asserts, that the trial court erred by discharging Juror No. 7.

Huerta contends that substantial evidence does not support his conviction on count 2 (Veh. Code, § 23153, subd. (f)). In particular, he argues that there is insufficient evidence to support the jury's finding that he was driving under the influence of a drug (i.e., marijuana) at the time he struck Alyson A. with his car.

A

On appeal, when a defendant challenges the sufficiency of the evidence to support his or her convictions, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which . . . a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) To be "substantial," the evidence must be of ponderable legal significance and reasonable in nature, credible, and of solid value. (*Id*. at p. 576.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if a verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

The standard of review is the same when the People mainly rely on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 (*Bean*).) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the

19

appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*Id.* at pp. 932–933.)

Count 2 charged Huerta with a violation of Vehicle Code section 23153, subdivision (f), which provides: "It is unlawful for a person, while under the influence of any drug, to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver." On count 2, the trial court instructed the jury with CALCRIM No. 2100 that: "A person is *under the influence* if, as a result of taking a drug, his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances. [¶] The manner in which a person drives is not enough by itself to establish whether the person is or is not under the influence of a drug. However, it is a factor to be considered, in light of all the surrounding circumstances, in deciding whether the person was under the influence." (Italics added.) Our Supreme Court has similarly described the phrase "driving under the influence" as meaning that the drug or alcohol has "so far affected the nervous system, the brain, or muscles as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1192–1193.)

B

Huerta argues that his conviction on count 2 must be reversed because there is insufficient evidence in the record to support the jury's finding that

at the time of the offense he was driving under the influence of a drug (i.e., marijuana) within the meaning of Vehicle Code section 23153, subdivision (f). In particular, he argues that he passed the FSTs and the evidence regarding the level of THC in his blood after the accident was insufficient to show that he was driving under the influence of marijuana at the time of the accident.

However, based on our review of the record, we conclude that there is substantial evidence to support the jury's finding that Huerta was driving under the influence of marijuana at the time he struck Alyson A. with his car. Importantly, numerous witnesses testified at trial regarding Huerta's reckless and erratic driving prior to the accident. Those witnesses described how Huerta was driving between 80 and 120 miles per hour as he approached, and then came extremely close to, bicyclists participating in the Tour De Palm Springs bicycle ride. Immediately prior to the accident, he drove into the opposing lane of traffic to pass a truck, encountered a car headed toward him, headed north onto the dirt far shoulder, swerved south back toward the road, and then lost control of his car. His car "fishtailed," struck Mark K. and Alyson A., who were riding their bicycles along the road, and then rolled over after hitting a berm along the south side of the road.

Immediately after the accident, Huerta threw his bong out of the car. While waiting for police to arrive, he was rambling, did not make sense, and appeared "out of it." When police arrived about 20 minutes later, Huerta's lips were very white, his voice was raspy, his mouth was dry, he was fidgety (e.g., rubbing his arms and hands a lot), and his eyes quickly wandered back and forth "almost like paranoidal-style." At trial, Severing testified that the type of driving exhibited by Huerta was consistent with a person driving under the influence of marijuana. Kee testified that the above physical

21

symptoms that he observed on Huerta were consistent with marijuana impairment. Steward likewise testified that Huerta's symptoms were consistent with a person being under the influence of marijuana. Thomas smelled an odor of marijuana emitted from Huerta and his car (although he did not smell it on Huerta after he left his car). Also, physical evidence of marijuana use was found at the scene (e.g., bong, two cannabis containers, and a lighter).

At 11:45 a.m. after the accident, Huerta performed satisfactorily on many of the FSTs, but missed the tip of his nose once on the finger-to-nose test and during the walk-and-turn test took ten instead of nine steps and struggled to keep his arms at his side. Thomas believed that Huerta may have been driving under the influence of marijuana at the time of the accident and requested that a drug recognition evaluator conduct a further evaluation.

At 1:53 p.m., Severing, a drug recognition evaluator, evaluated Huerta. Although he concluded that Huerta was not under the influence of marijuana at the time he performed the various sobriety tests, Severing testified that he typically would not observe signs of impairment five to six hours after marijuana use. He further testified that the witnesses' descriptions of Huerta's driving immediately before the accident were consistent with a person driving under the influence of marijuana. In interviews with police, Huerta admitted that he smoked marijuana every other day and had smoked three bowls of marijuana with kief at 1:38 a.m. before the accident.

At 3:05 p.m. on the day of the accident, a blood sample was taken from Huerta showing, among other things, that he had six nanograms of delta-9-THC at that time. Steward testified that level of delta-9-THC was not consistent with a person who had last smoked marijuana at 1:38 a.m. and

would instead be consistent with a person who had smoked marijuana more recently, supporting a reasonable inference by the jury that Huerta smoked marijuana closer in time to the accident. Severing also testified that blood levels of THC can drop 80 to 90 percent within 30 minutes after marijuana use. Furthermore, even with a lower blood level of THC, a person could still be impaired because of THC in his or her brain. Although impairment generally lasts for three to five hours after marijuana use, a person could remain impaired for up to 24 hours afterward.

We conclude that the above evidence constitutes substantial, if not overwhelming, evidence to support the jury's finding that at the time of the accident Huerta was driving under the influence of marijuana within the meaning of Vehicle Code section 23153, subdivision (f), as charged in count 2.

To the extent Huerta cites evidence and inferences that would have supported a contrary finding by the jury, he misconstrues and/or misapplies the substantial evidence standard of review. (*Bean, supra*, 46 Cal.3d at pp. 932–933; *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.) In particular, he cites the expert testimony of Okorocha, his forensic toxicologist, that there is no correlation between the level of THC in a person's system and impairment. Okorocha also testified that there were no studies showing a correlation between objective signs of marijuana use and impairment and that THC can impair a person only for two or three hours. He opined that if a person had smoked three bowls of marijuana with kief at 1:48 a.m., that person would not be impaired at 9:00 a.m. (i.e., seven hours later). Because on appeal we consider the evidence and all reasonable inferences therefrom favorably to support the jury's finding, we conclude that Huerta's citation of Okorocha's testimony and other evidence and inferences that would have supported a contrary finding by the jury, does not show that the jury's finding

23

was not supported by substantial evidence.  (*Bean*, at pp. 932–933; *Schmidt*, at p. 582.)

## IV

*Section 1385, subdivision (c)(2)(F) Mitigating Circumstance*

Huerta contends that the trial court erred by finding at his sentencing hearing that the mitigating circumstance listed in section 1385, subdivision (c)(2)(F) did not apply to his offense.  In particular, he argues that his count 2 offense was not a "violent felony" within the meaning of that statute.

## A

Under section 1385, subdivisions (a) and (b), a trial court generally has the authority to dismiss an entire action or a part thereof (e.g., an enhancement) or instead strike the punishment for that enhancement in the furtherance of justice.  (*People v. Bonnetta* (2009) 46 Cal.4th 143, 145–146 [§ 1385 authorizes trial court to dismiss entire action or only an enhancement allegation].)  Effective January 1, 2022, section 1385 was amended to add subdivision (c), which provides in relevant part:

> "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.  [¶] . . . [¶]  (F) *The current offense*

24

> *is not a violent felony as defined in subdivision (c) of Section 667.5.*" (§ 1385, subd. (c), italics added.)

Section 667.5, subdivision (c) provides in relevant part: "For purposes of this section, 'violent felony' means any of the following: [¶] . . . [¶] (8) Any felony in which the defendant inflicts great bodily injury on a person other than an accomplice, which has been charged and proved as provided for in Section 12022.7. . . ."

"The proper interpretation of a statute is a question of law we review de novo." (*People v. Lewis* (2021) 11 Cal.5th 952, 961 (*Lewis*).) In interpreting a statute, our fundamental purpose is to effectuate its purpose. (*Ibid.*) We begin by examining its words, giving them a plain and commonsense meaning. (*Ibid.*) We also consider the entire substance of the statute in determining the scope and purpose of a provision. (*Ibid.*) If the language of the statute allows more than one reasonable interpretation (i.e., its language is ambiguous), only then may we consider extrinsic sources, such as the statute's purpose, its legislative history, and public policy. (*People v. Walker* (2024) 16 Cal.5th 1024, 1032 (*Walker*).)

B

At Huerta's sentencing hearing, the trial court considered each of the factors set forth in section 1385, subdivision (c)(2) and found that none of them applied in this case to serve as a mitigating factor that would greatly weigh in favor of its dismissal of the jury's true finding on the allegation that in committing count 2, Huerta personally caused Alyson A. great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). In particular, the court found that section 1385, subdivision (c)(2)(F) did not apply in this case because Huerta's "current offenses, as convicted, are violent offenses and are strike offenses pursuant to [section 667.5, subdivision (c)]." Accordingly, finding no mitigating circumstances under section 1385, subdivision (c)(2),

25

the court declined to exercise its discretion to strike the count 2 enhancement and sentenced Huerta to a consecutive two-year term for count 2 plus a consecutive three-year term for its related section 12022.7, subdivision (a) enhancement.

C

Huerta argues that the trial court erred by finding section 1385, subdivision (c)(2)(F) did not apply as a mitigating circumstance in his case because his count 2 conviction for violating Vehicle Code section 23153, subdivision (f) is not a "violent felony" within the meaning of section 667.5, subdivision (c) and, thus, within the meaning of section 1385, subdivision (c)(2)(F).[7]  However, in so arguing, Huerta ignores the true nature and circumstances of his count 2 felony offense, which included both his Vehicle Code section 23153, subdivision (f) offense *and* its related section 12022.7, subdivision (a) enhancement for personally inflicting great bodily injury on Alyson A.  As discussed above, section 1385, subdivision (c)(2)(F) applies as a mitigating circumstance only if "[t]he current offense *is not a violent felony as defined in subdivision (c) of Section 667.5.*"  (Italics added.)  Independently interpreting that language, we conclude that its words are plain and unambiguous that a court must refer to section 667.5, subdivision (c) to determine whether the "current offense" is not a violent felony.  (*Lewis, supra*, 11 Cal.5th at p. 961; *Walker, supra*, 16 Cal.5th at p. 1037.)

---

[7]     We reject Huerta's assertion that the court's use of the plural term "offenses" in its discussion necessarily means that it considered count 1 as the "violent felony" for imposing the middle term for count 2.  We presume the court correctly followed the law and therefore considered only his count 2 offense in imposing the middle term for count 2.

26

As the trial court noted, section 667.5, subdivision (c)(8) lists one type of "violent felony," namely, "[a]ny felony in which the defendant inflicts great bodily injury on a person other than an accomplice, which has been charged and proved as provided for in Section 12022.7." The plain and unambiguous meaning of that language is that a "violent felony" under that statute includes any felony which, although not a violent felony by itself, includes a section 12022.7 enhancement. Therefore, because Huerta's count 2 conviction included a section 12022.7, subdivision (a) enhancement for personal infliction of great bodily injury on Alyson A., his count 2 felony offense was, by definition, a "violent felony" within the meaning of section 667.5, subdivision (c)(8) and, thus, section 1385, subdivision (c)(2)(F). Accordingly, we conclude that the trial court correctly found that section 1385, subdivision (c)(2)(F) did not apply as a mitigating circumstance at his sentencing hearing.

## V

### *Rule 4.421(a)(1) Aggravating Factor*

Huerta contends that substantial evidence does not support the trial court's finding that the aggravating factor under rule 4.421(a)(1) applied to support its imposition of the middle two-year term for count 2.

### A

Sentencing courts have broad discretion in selecting the lower, middle, or upper term for an offense. (§ 1170, subd. (b); *People v. Sandoval* (2007) 41 Cal.4th 825, 847.) In reviewing a court's exercise of its sentencing discretion, we apply the abuse of discretion standard. (*Sandoval*, at p. 847; *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978.) On appeal, a defendant has the burden to show the trial court abused its discretion by

making a sentencing decision that was irrational or arbitrary. (*Alvarez*, at p. 977.)

In exercising its sentencing discretion, a trial court may consider, among other things, aggravating circumstances, including "a particular fact in making the offense distinctively worse than the ordinary [offense]." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110.) Rule 4.421 lists circumstances in aggravation that a trial court may consider in sentencing a defendant, including certain factors related to the crime. (Rule 4.421(a) ["Factors relating to the crime, whether or not charged or chargeable as enhancements, include [list of 12 factors]."].)[8] Rule 4.421(a)(1) sets forth one factor related to the crime: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness."

## B

At Huerta's sentencing, the prosecution argued that the rule 4.421(a)(1) aggravating factor applied to Huerta's count 2 offense because the cruelty, viciousness, or callousness disclosed by that offense was "worse than what's necessary to commit the crime." Huerta disagreed and argued, among other things, that the rule 4.421(a)(1) aggravating factor did not apply because the terms "cruelty, viciousness, and callousness" are not defined in that rule and

---

[8] Prior to 1991, the phrase "whether or not charged or chargeable as an enhancement" was included in the main text of rule 4.421(a)(1). Effective as of January 1, 1991, that phrase was amended and placed in rule 4.421(a)'s introductory language, as quoted above. (See Judicial Council of Cal., Admin. Off. of Cts., Rep. on Sentencing Rules (1990) Recommendations of the Sentencing Advisory Com., p. 33 ["The 1990 amendments to this rule and the comment included the deletion of most section numbers. These changes recognize changing statutory section numbers and the fact that there are numerous additional code sections related to the rule, including numerous statutory enhancements enacted since the rule was originally adopted."].)

28

those terms should be interpreted as requiring a certain mental state.[9] The trial court disagreed with Huerta's argument, stating:

> "With respect to [rule] 4.421(a)(1) and its applicability to Count 2, the jury instruction [i.e., CALCRIM No. 3224] requires the People to have proven that the crime involved great violence or great bodily harm. And the first element is that during the commission of the crime, the defendant used great violence, or inflicted great bodily harm, showing a high degree of cruelty, viciousness, or callousness. That's not a mental state, in my mind. It just requires that a certain result from the crime evidenced a high degree of cruelty, viciousness, [or] callousness.
>
> "In that respect, I find that [rule] 4.421(a)(1) is applicable and there is evidence, beyond a reasonable doubt, within the record of the trial to make that finding as to Count 2.
>
> "There's a second element. And that is that the type or level of violence, or bodily harm, was distinctly worse than was necessary to commit the crime. And in this case, there is such evidence in the record in the form of the very serious injuries to the victim in Count 2 [i.e., Alyson A.], certainly well beyond what's necessary to commit the crime itself."

After the trial court made its findings on applicable aggravating factors, the prosecution argued, among other things, that the trial court should impose the upper term of three years for Huerta's count 2 conviction based on the rule 4.421(a)(1) aggravating factor. The court instead imposed the middle term of two years for count 2, explaining: "I am doing that based upon my finding that [rule] 4.421(a)(1) is true, and that is the basis for concluding the lower term is not appropriate." The court further explained

---

9    As noted above, Huerta waived his right to a jury trial on the truth of alleged aggravating factors.

that "the imposition of the lower term [for count 2] . . . would be contrary to the interest of justice . . . ."

## C

Huerta argues that the court erred by finding the aggravating circumstance in rule 4.421(a)(1) applied to support its imposition of the middle term for count 2. In particular, he argues, as he did below, that the language of rule 4.421(a)(1) requires that the defendant have committed an offense involving great violence or great bodily harm with the mental state of doing so cruelly, viciously, or callously. We conclude that the court did not err by applying rule 4.421(a)(1) to impose the middle term for count 2.

Rule 4.421(a)(1) requires a finding that Huerta's count 2 offense "involved great violence, great bodily harm, threat of great bodily harm, or other acts *disclosing* a high degree of cruelty, viciousness, or callousness." (Italics added.) Therefore, the trial court properly considered the egregious circumstances of Huerta's count 2 offense (e.g., extreme reckless driving for a prolonged period while under the influence of marijuana that ultimately resulted in great bodily harm to Alyson A.) in determining that his count 2 offense disclosed a high degree of cruelty, viciousness, or callousness within the meaning of rule 4.421(a)(1). Assuming arguendo, and without deciding, that the language of rule 4.421(a)(1) implies a certain mental state is required (e.g., cruelty, viciousness, or callousness) as Huerta argues, we conclude that substantial evidence supports a finding that Huerta had the requisite mental state of a high degree of, at least, callousness in committing count 2. Because the facts and circumstances in this case show that Huerta's conduct in committing count 1 and count 2 were identical, a court may consider the jury's finding regarding count 1 in determining whether the requirements of rule 4.421(a)(1) were met, including any assumed mental

30

state requirement (e.g., cruelty, viciousness, or callousness). Here, in finding Huerta guilty of second degree murder on count 1, the jury necessarily found that he had, at least, the mental state of implied malice when he killed Mark K. The court instructed the jury with CALCRIM No. 520 that Huerta had implied malice if, among other things, at the time he acted, he knew his act was dangerous to human life and he deliberately acted with conscious disregard for human life. Therefore, by finding Huerta guilty of second degree murder on count 1, the jury necessarily found that at the time of his act (which involved the same conduct as in count 2), he knew his act was dangerous to human life and deliberately acted with conscious disregard for human life. We conclude that such a mental state necessarily meets, and even exceeds, the assumed mental state under rule 4.421(a)(1) that Huerta act, at least, callously in committing count 2. Therefore, assuming arguendo that rule 4.421(a)(1) requires that Huerta act with, at least, callousness in committing count 2, we conclude that the jury's guilty verdict on count 1, which involved underlying facts and circumstances identical to those in count 2, provides substantial evidence to support the court's finding that rule 4.421(a)(1) applied to his commission of count 2, including the assumed mental state of, at least, callousness. Therefore, the court did not abuse its discretion by finding the rule 4.421(a)(1) aggravating factor applied and, based thereon, imposing the middle term of two years for count 2.

Huerta also argues that the application of rule 4.421(a)(1) here would result in improper "double counting" of the elements of his count 2 offense.[10]

_____

[10] To the extent Huerta would also argue that there is improper "double counting" by our conclusion above that the jury's finding that he had, at least, implied malice in committing count 1 necessarily shows that he had the assumed mental state under rule 4.421(a)(1) that he act cruelly, viciously, or callously in committing count 2, we reject such an argument. Because the

31

In particular, he asserts that his count 2 offense and related enhancement for driving under the influence of marijuana and causing great bodily injury to Alyson A., involved the *same elements* as his driving under the influence and causing great bodily harm to Alyson A. disclosing a high degree of cruelty, viciousness, or callousness within the meaning of rule 4.421(a)(1).  We disagree.  Although Huerta correctly states that an element of a crime may not be used to impose a greater term of punishment for that crime (see, e.g., rule 4.420(d); *People v. Marshall* (1987) 196 Cal.App.3d 1253, 1259), rule 4.421(a)(1) requires a *greater* showing than the basic elements of his count 2 offense for violating Vehicle Code section 23153, subdivision (f) and personally inflicting great bodily injury within the meaning of section 12022.7, subdivision (a).  Specifically, for rule 4.421(a)(1) to apply, the court must find that, in addition to those elements for his count 2 offense and related enhancement, Huerta's offense "disclos[ed] a high degree of cruelty, viciousness, or callousness."  (Rule 4.421(a)(1).)  Because a showing of a high degree of cruelty, viciousness, or callousness is not an element of Huerta's count 2 offense or related enhancement, there was no improper double counting of elements when the trial court found that rule 4.421(a)(1)'s aggravating circumstance applied to support its imposition of the middle term for count 2.  Furthermore, contrary to Huerta's assertion, the court could reasonably find that his count 2 offense was distinctively worse than an offense involving only the basic elements of Vehicle Code section 23153, subdivision (f) and therefore properly applied rule 4.421(a)(1) as an

---

facts and circumstances underlying count 1 and count 2 were identical, any factual findings by the jury regarding count 1 may properly be considered by a court in determining whether rule 4.421(a)(1)'s requirements were met in Huerta's commission of count 2 and, in so doing, would not involve any improper "double counting."

"aggravating" circumstance in sentencing him. (Cf. *People v. Young* (1983) 146 Cal.App.3d 729, 734 [trial court erred by finding aggravating circumstance of "extreme serious nature" of defendant's offense when he was convicted of assault with a firearm, which "merely states the obvious"].)

## VI

### *Section 654*

Huerta contends, and the People concede, that the trial court erred by imposing sentences for both counts 2 and 3 in violation of section 654.

### A

Section 654, subdivision (a) provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  Therefore, section 654 prohibits multiple punishment for offenses committed during a single or indivisible course of conduct.  (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Latimer* (1993) 5 Cal.4th 1203, 1207–1208.)  Section 654 also prohibits the imposition of concurrent sentences for offenses committed during a single or indivisible course of conduct.  (*People v. Jones* (2012) 54 Cal.4th 350, 353.)  "[T]he accepted 'procedure [for such offenses] is to sentence defendant for each count and stay execution of sentence on certain [counts] to which section 654 is applicable.' "  (*Ibid.*)

Effective January 1, 2022, section 654 was amended to delete language that previously required a sentencing court to impose punishment for the offense providing for the longest possible term of imprisonment and stay punishment for the other offense(s) committed during a single or indivisible course of conduct.  (Stats. 2021, ch. 441, § 1; cf. former § 654, subd. (a) ["An act or omission that is punishable in different ways by different provisions of

33

law shall be punished under the provision that provides for the longest potential term of imprisonment . . . ."].) Accordingly, under amended section 654, a sentencing court now has discretion to impose punishment for any one of such multiple offenses, regardless of the length of its term of imprisonment.

## B

The jury convicted Huerta on count 2 for willfully and unlawfully driving a vehicle under the influence of a drug and proximately causing injury to Alyson A. (Veh. Code, § 23153, subd. (f)). The jury also convicted him on count 3 for driving in willful and wanton disregard for the safety of persons and proximately causing injury to a person (Veh. Code, § 23105, subds. (a), (b).) As the parties represent, although count 3 did not identify Alyson A. as the person injured, the evidence presented at trial necessarily showed that she was that injured individual in count 3.

At Huerta's sentencing, the trial court imposed the middle term of two years for count 2, plus a consecutive three-year term for the related section 12022.7, subdivision (a) enhancement for personally causing great bodily injury. The court also imposed a concurrent low term of one year four months for count 3.

## C

Huerta argues, and the People concede, that the trial court erred by imposing punishment for both count 2 and count 3 because both offenses arose out of a single or indivisible course of conduct. We agree. Both counts 2 and 3 were committed during Huerta's single or indivisible course of conduct of driving his car and causing injury to Alyson A. Therefore, section 654 prohibits punishment of Huerta for both counts. Because under amended section 654, the trial court has discretion whether to punish Huerta

34

for either count 2 or count 3, we reverse its imposition of punishment for both counts and remand the matter for the limited purpose of resentencing Huerta on count 2 and count 3.  In so doing, we refrain from expressing any opinion regarding how the trial court should exercise its discretion under section 654.

## DISPOSITION

The judgment is reversed to the extent that it imposes punishment for both count 2 and count 3.  In all other respects, the judgment is affirmed. The matter is remanded for the limited purpose of resentencing Huerta on count 2 and count 3 consistent with section 654 and our opinion.


IRION, Acting P. J.

WE CONCUR:


DATO, J.


BUCHANAN, J.